[No. S004355, Crim. No. 21840. June 30, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
DARRELL KEITH RICH, Defendant and Appellant.

1038

1042

1046

1058

**COUNSEL**

Maxim N. Bach, under appointment by the Supreme Court, for Defendant and Appellant.

Gary D. Sowards as Amicus Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Jane Kirkland, Ward Campbell, Garrett Beaumont and Edmund D. McMurray, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LUCAS, C. J.**—Defendant was charged in Shasta Superior Court with four counts of first degree murder, three counts of kidnapping, three counts of rape by force, three counts of rape by use of threats, one count of assault with intent to commit rape, two counts of oral copulation by force, one count of oral copulation of the victim by force, one count of oral copulation by a person over 21 on a person under 16, one count of attempted oral copulation, one count of sodomy by a person over 21 on a person under 16, and one count of assault with a deadly weapon by means likely to produce great bodily harm.

Each murder count further alleged as special circumstances that defendant had murdered the victims named in the other three counts. (Former Pen. Code, § 190.2, subd. (c)(5) (all further statutory references are to this code unless otherwise indicated).) One of the murder counts additionally alleged that defendant had murdered his victim, a child under 14, during the commission of a lewd and lascivious act. (Former § 190.2, subd. (c)(3)(iv).)

The cause was eventually transferred to Yolo County. During trial by jury, the indictment was amended to include an additional count of sodomy by force. The jury found defendant guilty as charged of three of the mur-

ders, and found the special circumstances of "felony murder lewd and lascivious act on a child under 14" and "multiple murder" to be true; on the other murder charge the jury found defendant guilty of second degree murder and found the multiple-murder special circumstance to be not true. As to the other 18 counts, the jury found defendant guilty as charged of all but three crimes.[1]

Immediately after the jury returned its guilt verdicts, the sanity trial commenced. The matter was submitted to the jury on the evidence presented during the guilt phase. The jury found defendant was sane when he committed the crimes. At the penalty trial, the matter was again submitted to the jury on the evidence presented during the guilt phase. The following day the jury fixed defendant's sentence at life without possibility of parole for one of the first degree murders and imposed death for each of the other two first degree murders. This appeal under the 1977 death penalty law is automatic. (§ 1239, subd. (b).)

## I. FACTS

### A. *The People's Case.*

The People introduced evidence[2] establishing the following:

#### 1. *Count I—The murder of Annette Edwards*

In early July 1978, Annette Edwards disappeared from her home in Redding. Her body was found three days later two miles from her apartment, about 75 feet down an embankment off a county road. She was lying on her back with her legs spread; her panties had been pulled below her knees and her tank top had been pulled above her breasts. A bloodstained trash can lid was near her, and additional evidence was also discovered at the scene.

The autopsy revealed severe injuries to her face and head. Her upper jaw had suffered two fractures: one began at the left midline and went through her left eye socket and into the lower portion of her skull to the base of her

---

[1] He was found not guilty of two counts of rape by force and one count of rape by use of threats. (See *post,* fns. 4-6.)

[2] With the exception of his first degree murder convictions, defendant does not challenge the sufficiency of the evidence or the circumstances surrounding the crimes. As to his first degree murder convictions, defendant asserts the evidence is insufficient to support a finding of premeditation and deliberation. Our review of the record reveals that there is sufficient evidence to support all of the jury's findings, including the findings of premeditation and deliberation (see *post,* pp. 1082-1083). Accordingly, the facts of the crimes need not be set forth in detail.

brain; the other followed a similar pattern but began on the right side of her face. The body had other injuries and bruises. The autopsy surgeon testified that a substantial amount of force was required to inflict the injuries on the jaw. The cause of death was described as basal skull fractures inflicted by blunt force.

### 2. Count II—The murder of Patricia Moore

In early August, Patricia Moore disappeared from a motel in Redding. Her nude body was found over two weeks later at the Igo dump. The autopsy revealed severe injuries to her face and head. Several of her teeth had been fractured or broken. Her head had sustained several blows, the most severe of which crushed the right side of the front of her skull. The wound measured about five inches in diameter and was probably inflicted by a heavy rock. There was evidence of manual strangulation. The cause of death was shock and hemorrhage from head wounds inflicted by blunt force.[3]

### 3. Count III—The murder of Linda Slavik

Also in early August, Linda Slavik went to a bar in Chico with a friend. Slavik's friend left the bar about 1 a.m.; she returned approximately 45 minutes later and found Slavick gone. Slavik's nude body was found at the Igo dump, about 20 feet from Patricia's body. Slavick had been shot twice: one bullet entered the front of her neck and struck her spine, the other bullet was fired into her open mouth and severed the spinal column, causing instant death.

### 4. Count IV—The murder of Annette Selix

On an evening in mid-August, 11-year-old Annette Selix left her home in Cottonwood and walked to a nearby market to buy groceries. Her body was found the following day underneath a bridge in Shasta County. She had been stripped naked except for her panties. The autopsy revealed that she was still alive at the time she had been thrown off the bridge, and that she had been forcibly raped and had performed oral copulation. She suffered several broken bones as well as substantial internal bleeding. Bite marks were found on the victim's thigh and it was positively determined that defendant had inflicted the wound.

---

[3] The jury returned a second degree murder verdict as to this count.

### 5. Counts V and VI—The assault and attempted forcible oral copulation on Donna W.

On an evening in mid-June 1978, Donna W. left her home in Redding and began walking to a nearby market. Defendant attacked her from behind, pushed her off the road and threw her down a hill. He grabbed her hair and blouse, threatened to kill her, and asked if she wanted to give him "a blow job." When Donna said no, defendant hurled her to the ground and began hitting her on the head with a blunt instrument. He struck her at least 10 times. Donna's head injuries prevented her from climbing up the hill to the main road; she remained at the foot of the hill for more than 12 hours before a passerby saw her and called for help.

### 6. Counts VII - XI—The kidnap, rape and oral copulation of Robin H.

In mid-June 1978, Robin H. went to the Anderson fair with a friend. She left the fair alone around 11 p.m., and walked past defendant, who was in his car parked on the side of the road. When defendant called for her to come to him, Robin declined, and defendant drove off. Robin took off her shoes and started running to a bus depot. Suddenly, defendant grabbed her from behind and carried her to his car.

Defendant placed Robin in the front seat, grabbed her hair, and pushed her head between her legs. Defendant then drove off. Soon thereafter, defendant ordered Robin to take off her clothes. He parked the car and commanded Robin to lie down and cover her eyes with his shirt so she could not see him. Defendant then proceeded to rape and orally copulate her. He also forced Robin to orally copulate him. Robin was finally released; defendant told Robin he knew where she lived and threatened to kill her if she told anyone what he had done.[4]

### 7. Counts XII - XV—The kidnap, oral copulation, sodomy and assault with intent to commit rape of Lisa S.

On an evening in late June 1978, 14-year-old Lisa S. was walking with a boyfriend in Redding when defendant drove up next to them. He asked if they would like a ride, and they accepted. Lisa's boyfriend opened the door and Lisa began to climb in; as she did so, defendant grabbed her, pulled her into the car, and sped off. Defendant ordered Lisa to take off her clothes. He

---

[4] The indictment charged two counts of rape of Robin H. Because the evidence established only one rape, the jury found defendant not guilty of forcible rape but guilty of rape by use of threats.

then parked the car and attempted to rape Lisa, but could not achieve penetration. He ordered Lisa out of the car and sodomized her. He also forced Lisa to orally copulate him, and eventually released her.

### 8. Counts XVI and XVII—The rape of Marla Y.

On an evening in early July 1978, Marla Y. was walking in Redding when defendant grabbed her. She fought until he knocked her unconscious. When she regained consciousness, she realized defendant was rolling her toward a body of water. She again began to struggle. Defendant ripped off her shirt and ordered Marla to remove her pants. Defendant covered Marla's face with her pants so she could not see him and then raped her. He ordered her not to look up and then he left.[5]

### 9. Counts XVIII - XXII—The kidnap, rape, oral copulation and sodomy of Kelly M.

On an evening in mid-July 1978, 15-year-old Kelly M. left her home in Red Bluff and bicycled to her cousin's house to visit. As she returned home, defendant passed her and asked for the time, then grabbed her by the hair and pulled her off her bike. He hit her in the eye, forced her into his car, and drove off. While driving, defendant held Kelly by the hair and forced her head between her legs. He ordered her to take off her clothes. Defendant parked the car and forced Kelly to orally copulate him. He then started the car and drove to another location. En route, defendant threatened to hit her on the head with a flashlight if she did not do as he asked. He also told her that he had a gun under his seat and a dead body in his trunk. When defendant stopped the car again, he sodomized, raped, and orally copulated Kelly. He eventually let her go.[6]

### 10. The arrest and investigation

The circumstances surrounding defendant's arrest and the police investigation are as follows: In mid-August 1978, defendant, who was riding a "street bike," asked a friend if he wished to go "dirt bike" riding. His friend declined. About 20 to 30 minutes later, defendant returned and told his friend that he had found a human body. Defendant led him to the Igo dump, and showed him a body. There were no tire marks where defendant

---

[5] The indictment charged two counts of rape of Marla Y. Because the evidence established only one rape, the jury found defendant guilty of forcible rape but not guilty of rape by use of threats.

[6] The indictment charged two counts of rape of Kelly M. Because the evidence established only one rape, the jury found defendant not guilty of forcible rape but guilty of rape by use of threats.

claimed to have driven, and defendant could not have traveled the distance from his friend's house to the Igo dump and back in the time he had been gone. They went and called the police from the nearest telephone. The police arrived, saw two bodies, and began an investigation.

Meanwhile, in the course of their investigation into the murder of Annette Selix, Shasta County officers interviewed defendant. He was at that time not a suspect; he was interviewed because the police knew that defendant had worked for Selix's mother. The discussion lasted approximately one hour. When it was over, one of the officers, Detective Brewer, asked defendant if he would submit to a polygraph examination on the Selix murder,[7] and defendant agreed.

Defendant arrived at the Shasta County Sheriff's Department at 4 p.m. the following day. Detective Brewer learned that defendant had reported finding bodies at the Igo dump, and he asked defendant about those bodies. Defendant replied that he had seen only one body, not two, at the dump. Detective Brewer concluded that because there was as yet no evidence connecting defendant to the Selix murder, but there was evidence that defendant found the bodies at the Igo dump, it would be "more relevant" or "more reasonable" to question defendant about the Slavik and Moore murders during the polygraph examination.

Defendant was taken to the room where the polygraph examination would be administered. He was read his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) and waived them. He also signed a written waiver of his *Miranda* rights on a document entitled, "Waiver, Shasta County Sheriff's Department, for Polygraph Test." After explaining the procedure and putting defendant at ease, the examiner administered the polygraph examination.

The examination lasted about 15 minutes. One of the questions asked of defendant was whether he had murdered the girl whose body he claimed to have found at the Igo dump. When the examination was over, the examiner spoke with Detective Brewer outside of defendant's presence and informed him that he believed defendant was lying when he denied involvement in the murders. Brewer then met with defendant and questioned him further about the murders.

Detective Brewer testified that at this point defendant was a suspect only to the extent that he had apparently failed the polygraph test. Brewer

---

[7] The police asked defendant to submit to the test because, as they explained, "[Annette Selix] lived in Cottonwood and it was almost . . . coming to the point that [they were] going to run everybody in Cottonwood on the polygraph." Defendant lived in Cottonwood.

informed defendant that it appeared he had been lying during the polygraph examination. Defendant replied that he thought the test was fairly administered, and he could not explain why he failed it.

Brewer then discussed with defendant "what I thought to be unusual behavior or unaccounted for activity, [or] an accounting that was not satisfactory." Defendant became nervous; he lost eye contact with Brewer and paused for long periods before responding to questions. Defendant twice said he was going to leave. Brewer asked him to stay and talk about the case. Finally, defendant stood up, said he was going to leave, and told Brewer, "I've got something to tell you, but not now." Defendant said he would call Brewer in a few days, and left. On his way out, defendant asked Brewer for his business card, and Brewer complied. Brewer asked defendant when he could expect a call and defendant said within three days. Defendant then left.

Early that evening, defendant met with his friend Gale Croxell and Croxell's girlfriend. Defendant told them that he had taken and failed a polygraph examination about finding the bodies at the Igo dump; he said the only question he got right was his name. The three went to defendant's house where they discussed the matter further. Croxell asked defendant why he rode his street bike on a dirt road; defendant said "he wanted to see if they [were] still there." Croxell then asked defendant whether he had committed the murder; defendant said yes. He said the Hell's Angels paid him $7,000 to kill the girl. Croxell also asked about the second body; again, defendant said, "yes." He said he had met her at the Madison Bear Gardens in Chico, and had killed her because "she was in the wrong place at the wrong time." He then acted out the kidnap and murder of Linda Slavik and told his friends "he shot her in the head and the neck with a .22 [-caliber pistol]."

Defendant said he had thrown the pistol in a river and the police would never find it. He also said that the .22 rifle, which he had used to kill the other woman, was at his mother's house. Later, Croxell's girlfriend contacted the sheriff's department and gave them a written statement which included the information that one of the murder weapons was at defendant's mother's house.

Around 9 that evening, defendant saw two of his friends near a liquor store. He approached them and told them he had failed the lie detector test. He said "he had until 7 o'clock the next day to come up with an alibi or [the police] were going to pick him up." Before leaving, defendant said, "Hey guys, I'll level with you. I snuffed her for $7,000."

Defendant's friends telephoned the police. When Detective Brewer received this additional information he decided to arrest defendant immediately. He learned that defendant's motorcycle was outside the Oarlock Bar in Redding. Brewer, accompanied by other officers, arrived at the bar about 11 p.m. and placed defendant under arrest. Defendant was not told he was under arrest; he was handcuffed and told he was going back to the sheriff's department. Officers then drove defendant back to the station.

Once at the station, defendant was placed in an interrogation room; a tape-recording system was turned on without defendant's knowledge and Detective Brewer questioned defendant for almost two hours. A transcript of the interview, in which defendant confessed to various of the charged murders, spans 45 pages.

At the conclusion of the interview, Brewer and defendant returned to the Oarlock Bar. They arrived about 2 a.m. and retrieved without a warrant some of defendant's personal property from a car located in the bar's parking lot; both defendant and the owner of the car consented to the search.

Brewer then drove with defendant around the area, and defendant pointed out where evidence could be discovered. He also told Brewer that they should retrieve the .22 rifle from defendant's mother's house. Defendant's mother was out of town, and defendant consented to a search of her house; he led Brewer to a bedroom closet, picked up the rifle, and handed it to him.

They returned to the station about 3:30 a.m. Defendant was booked and transported to the sheriff's substation in Burney, approximately 50 miles from Redding. He was transported to Burney instead of being housed in the Shasta County jail because jail trustees had previously informed the sheriff's department that the person responsible for the Selix murder "would be taken care of when he was placed in our jail." Before leaving, defendant agreed to submit to a second polygraph examination at Burney.

Later in the early morning of August 24, Russell Swartz, a public defender, visited defendant at the Burney substation. Defendant had not requested to see an attorney and by the time Detective Brewer arrived to arrange for the second polygraph test, Swartz had left. Brewer was informed of Swartz's visit by Lieutenant Eoff, the deputy sheriff in charge of the Burney substation. Brewer telephoned District Attorney Robert Baker for legal advice. Baker told Brewer that he could proceed with the polygraph examination if defendant wished to take it. Baker explained that Swartz had not been appointed to represent defendant, and that what was involved "was [defendant's] right to counsel, not counsel's right to seek a client." He counseled Brewer to "leave the [question] to [defendant] entirely."

Detective Brewer contacted defendant, who agreed to take another polygraph examination. The interrogation was interrupted when Swartz returned to the substation and advised Brewer that defendant was "his client." Swartz also told defendant to stop talking. Brewer informed Swartz of the legal advice he had received and the two then telephoned District Attorney Baker. Baker again advised Brewer "[t]hat it was to be left to [defendant] entirely. [I was] to advise him that it was his choice whether to retain [Swartz] as counsel or not, and that choice was to be made by [defendant]. If he chose to retain [Swartz] or to be represented by [him], then we were naturally to stop; if not, we could proceed with our polygraph examination."

Detective Brewer informed defendant that the choice was his. Swartz told defendant at least twice that he could be facing the death penalty. Defendant was then asked whether he wished Swartz to represent him and defendant said "he guessed that he'd better." All interrogation ceased and Swartz left.

That afternoon, a consent search was conducted of defendant's residence. The refrigerator was searched and found to contain the grocery items Annette Selix had purchased moments before she was kidnapped. The following day, August 25th, Detective Brewer obtained the services of a technician from a local hospital, who retrieved hair and blood samples from defendant pursuant to a search warrant.

On August 26, Lieutenant Eoff visited defendant in jail. Defendant began speaking about his parents and his childhood. He then told Eoff "he didn't understand how he could have done what he did."

On August 28, after defendant's arraignment, he told Eoff that he had been embarrassed by everyone looking at him in court. He also asked Eoff why the investigation was continuing when he had admitted committing the crimes. Eoff explained that an investigation does not end when a person is taken into custody. Defendant said, "I'll admit to anything I have done but I won't admit to anything I haven't done." He added that he "should have stopped a long time ago but couldn't."

The following day, about 9 a.m., defendant told Eoff he wished to speak to him but that he wanted to talk with his attorney first. Eoff allowed defendant to telephone Swartz; they spoke for about five minutes. On the way back to his cell, defendant told Eoff that he still wished to speak with him. Eoff told defendant "to think about it, and if he still wanted to talk to me at a later time I would listen to whatever he had to say." Thereafter, Eoff received word around 4 p.m. that defendant wished to speak with him.

Eoff met with defendant and told him "that he shouldn't talk to me" because "he had an attorney at that point." Defendant insisted he wished to talk. Eoff said he would not ask any questions but that he would listen to what defendant wished to say.

Eoff informed defendant that he would tape-record the conversation; he obtained a tape recorder and brought it into defendant's cell. The tape recorder was placed in plain view and turned on; defendant then admitted that he had killed Annette. The only question Eoff asked defendant was whether he was referring to the 11-year-old girl; defendant clarified that he was referring to Annette Selix. Later, defendant signaled Eoff to turn off the tape recorder; Eoff complied.

Defendant then told Eoff he had "made a list of everything that he was responsible for and that he hadn't done anything else other than what was on the list." Defendant asked Eoff if he wanted to see the list and Eoff said yes. Defendant handed him a piece of paper and reiterated that "everything he had done was on that list." Eoff asked defendant if the list was for him; defendant said, "[i]f you would like to have a copy I can make you a copy of it." Defendant then told Eoff that he could also use a copy machine if he had one available. Eoff replied, "Fine. We have a copy machine here and I can make a copy of it." When Eoff returned the original to defendant, defendant asked Eoff if he wished him to sign it, and Eoff said, "No."

On August 31, Detectives Lambert and Brewer transported defendant from Burney to Redding for a court appearance. While waiting, Brewer asked Lambert what one of the officers had learned from defendant's girlfriend, Darlene Munsinger. Lambert responded that it appeared that Munsinger had "figured . . . out . . . what was going on." According to Lambert, defendant then volunteered that he "knew this was true because he had told his girlfriend that he had killed a girl." Lambert informed defendant that he "preferred" not to discuss the case and that he could not question him. Defendant responded that "the only murders or rapes that he had committed were the ones that he had written down on the list and given to Lieutenant Eoff."

On September 6, defendant took another polygraph examination with Swartz's consent. Eoff drove defendant from Burney to Redding for the test. En route, they drove down a road near the location where Annette Edwards's body was found. Defendant said it bothered him to drive through the area "because of what happened here." Eoff said he could not discuss the case. After the polygraph examination, defendant asked Detective Lambert whether he knew the results of the test questions concerning the murder of one Georgia Ruel. He told Lambert that one of the questions was

whether he had thrown a girl off a bridge; he explained that he had thrown a girl off a bridge, but she was not Ruel. On the way back to Burney, defendant asked Eoff if he knew the results of the polygraph test. He told Eoff that "he felt much better, that he had taken the polygraph and felt he passed it." He further stated that "what he had admitted to was all that he had done."

On September 8, Detective Lambert secured a search warrant authorizing him to obtain a bite sample from defendant. Defendant inquired which victim possessed bite marks; Lambert answered that it was Annette Selix. Defendant said he did not remember biting her. Pursuant to a second search warrant, Lambert obtained additional teeth impressions the following day; defendant told Lambert that "he was sure he had not bitten Annette Selix."

On November 28, defendant sent for Detective Lambert and asked Lambert why he did not like him. Lambert denied disliking defendant. He explained that, having seen the bodies of the murder victims, he could understand why someone with less experience would hate defendant, but that he did not feel that way. According to Lambert, "[defendant] replied that he knew the feeling because he had seen the bodies, and that the only reason he got caught was because he wanted to be caught."

On December 11, Detective Lambert was informed that defendant might attempt suicide. He went to the jail to speak with defendant, who told Lambert that he was very depressed, and had tried to hang himself but was unable to go through with it. He also said that he had left a letter for Lambert in a shoe box and that Lambert could have the letter. Lambert retrieved the shoe box and brought it to defendant, who gave the letter to Lambert. It stated in part, "I didn't kill anyone that I hadn't said I did. I'm telling you the truth, whatever. I hate myself. God help me."

B. *Defense Evidence*

As noted above, the defense presented no additional evidence at the sanity and penalty trials, but instead relied on the evidence introduced at the guilt trial. That evidence was as follows: Defendant's complete family, medical and social history were presented through numerous lay witnesses (defendant's mother, sister, two uncles, ex-wife, and three ex-girlfriends, his family doctor, two of his grammar school teachers, his grammar school principal, his school psychologist, his eighth-grade teacher, both his high school assistant principal and principal, two of his high school teachers, four coworkers, a psychiatric social worker, three probation officers, a California Youth Authority parole agent, a police officer, and others) as well as six expert witnesses.

Defendant was adopted, and had a difficult childhood. His mother was domineering. She took care of other people's children for a living, and defendant resented the attention those other children received. Nevertheless, he was helpful with the other children, and once rescued another child from a canal.

Defendant performed poorly in grammar school, and was kept back in the first grade. His parents fought constantly, and he had few friends. He was referred to the school psychologist, who reported that defendant might become violent, but defendant received no treatment.

He exhibited suicidal tendencies after his parents divorced when he was about 15 years old. Initially he lived with his mother in Southern California, but returned to live with his father and new stepmother in Northern California. His academic performance deteriorated in his sophomore year of high school. He transferred to a continuation school, where his grades improved. He was suspended for fighting, and was sometimes truant.

At age 17, after one of numerous disagreements with a girlfriend, he went hunting and shot himself in the chest, in what was possibly an attempted suicide. Later, he fired a shot over a police car, and claimed he hoped the officer would return the fire and kill him. A subsequent psychiatric evaluation disclosed defendant was suicidal and urged treatment, but defendant terminated the therapy.

When he was 18 he became drunk and repeatedly rammed another automobile with his mother's car. Thereafter he was sentenced to a county jail camp, where he received counseling. His probation officer noted defendant had a short temper, especially when he was drinking; otherwise, defendant was friendly and responsible. The officer recommended defendant seek psychiatric help, but defendant maintained that after his counseling in jail he was "in control" and had learned to deal with his temper.

At 19 defendant, acting in a crazed manner after drinking, attacked a person with a tire iron. When he heard the police approaching he smashed his fist through the windshield of the victim's car and drove off. He was arrested, and went berserk while being treated for his injury. He was sentenced to the California Youth Authority. There he was diagnosed as not having psychological problems, but it was recognized that he exhibited bizarre behavior. Defendant learned that his girlfriend was pregnant by him, and they married. When released, he lived with his wife and child, and secured a job at a lumber mill.

Initially, his parole agent felt defendant's progress was good. Thereafter, however, defendant hit his wife on two occasions. For the next five months,

he managed to control himself. Then, in April 1976 he was injured in a car accident and required numerous stitches on his face, resulting in a severe scar across his nose. This made him very depressed. In late 1976 he once again hit his wife, and in August 1977 he told her to leave, which she did. They divided their property, and defendant voluntarily paid child support. At work, defendant became less cheerful and more hot-tempered, and his attendance deteriorated.

He met Darlene Munsinger, who was visiting from out-of-state, and she moved in with him. They had problems, and she left, only to return and leave again after a fight. At defendant's request, Munsinger returned once more to stay with him in April and again in June of 1978. In late July 1978 she left him for the last time because she had become afraid of him; she thought he provoked fights to give him an excuse to leave the house. When he learned she was leaving he said he was glad she would not be around "when all the stuff came up." Munsinger asked, "what stuff," and defendant replied, "I'll tell you sometime but not now," and that if he had met her earlier "none of this would have happened."

Each of the women with whom defendant had become romantically involved testified defendant had engaged in sexual intercourse with them by mutual consent, and that he had not engaged in unusual acts, such as sodomy.

As noted above, defendant presented six expert witnesses. He first called the two court-appointed psychiatrists, Drs. French and Kaldor, both of whom testified that although defendant had an antisocial personality, he was sane, and did not suffer from mental disabilities that would prevent his forming the intent to kill.

Dr. Wilson testified he had difficulty diagnosing defendant, but he believed defendant might suffer from an "intermittent explosive disorder." He admitted on cross-examination, however, that defendant did have the capacity to intend, premeditate, and deliberate a killing, as well as the non-homicidal offenses.

Dr. Morrison also diagnosed defendant as suffering from intermittent explosive disorder, major depression, and a borderline personality disorder, but he stated that defendant did not fit the profile of one suffering from an antisocial personality, or sexual sadism. Morrison believed defendant could not form the mental states to rape and kill Edwards and Moore, or to kill and commit the sexual acts against Selix, but Morrison could not arrive at a conclusion as to the Slavik homicide and sexual acts. He felt defendant was insane at the time of the crimes against Edwards, Moore and Selix.

Dr. Satten testified defendant suffered from an intermittent explosive disorder and a borderline personality, and had mild brain damage. He felt defendant did not meet the profile of one suffering from an antisocial personality disorder or sexual sadism. Like Dr. Morrison, Satten believed defendant could not form the mental states to rape and kill Edwards and Moore, or to kill and commit the sexual acts against Selix. Also, like Morrison, Satten believed defendant was insane at the time of the crimes against Edwards, Moore and Selix, but he could not arrive at a conclusion as to the Slavik sexual acts and homicide.

Finally, Dr. Axelrad testified that he had subjected defendant to a lengthy hypnotic narcoanalysis session, and that the results showed defendant (i) suffered from borderline personality disorder, intermittent explosive disorder, and major depression, but (ii) did not suffer from antisocial personality disorder or sexual sadism. Unlike the previous experts, he felt defendant suffered from diminished capacity as to each of the homicides and each of the related crimes (except for the rape of Slavik, as to which he testified he could not make a judgment). He believed defendant was insane at the time of the homicides and related crimes, but like Dr. Morrison he stated he had insufficient information to make a judgment as to the non-homicidal offenses against Donna W., Robin H., Lisa S., Marla Y. and Kelly M.

C. *Rebuttal Experts*

The People offered four experts in rebuttal. Dr. Von Dedenroth testified that Dr. Axelrad's hypnotic narcoanalysis interview had been improperly conducted, and that it did not provide a sufficient basis on which to form a valid psychiatric diagnosis. Dr. Kaldor resumed the stand, and also questioned the results of the narcoanalysis session. He stated his belief that such techniques are unreliable for factfinding, and he generally reaffirmed his earlier testimony that defendant did not suffer from diminished capacity at the time of the homicides. Likewise, Dr. French reaffirmed his previous testimony, questioned the validity of the narcoanalysis session conducted by Dr. Axelrad, and noted inconsistencies in Dr. Morrison's report. Finally, Dr. Robinson testified that defendant's asserted memory failure about various of the killings was not caused by organic brain dysfunction, or psychotic or schizophrenic functioning, and there was no evidence of current memory dysfunction. He testified that results of various tests given defendant by the other experts disclosed that defendant was simply (and "badly") faking in order to gain sympathy and avoid responsibility for his actions. He admitted on cross-examination that a person in the midst of an explosive disorder might lose his memory during that time.

## II. Pretrial Issues

### A. *Jurisdiction of the Shasta Superior Court*

As noted, the original indictment was filed in Shasta County. Thereafter, defendant notified the trial court that he would seek a change of venue. The prosecution expressed its belief that if the motion were granted the court should, pursuant to rule 842 of the California Rules of Court, contact the Administrative Office of the Courts to seek out an appropriate transferee court, "[b]ut all legal motions would be held here in Shasta County." The court agreed.

Thereafter, the venue motion was continued to the following week. The court stated, however, "[w]e may as well confirm on the record the discussions we had in chambers concerning the convenience factors that would affect a motion for change of venue, in view of the court's rules that require that all further proceedings be had prior to trial in the county to which transfer would take place. I feel that there are substantial reasons why it would be prejudicial to both sides to move the matter prematurely, which would require traveling back and forth by parties and their counsel, which would be time-consuming and probably not lend itself to better handling of the matter. I will check with the Administrative Office of the Courts between now and next Monday and verify what the possibilities are . . . ."

Defendant thereafter filed his venue motion. At the hearing, the prosecution offered to stipulate that all pretrial motions would be heard in Shasta County. Defense counsel responded, "[t]hat stipulation is acceptable to us. I have some question in my mind as to whether, if the court actually makes an order transferring venue to another court, whether it has jurisdiction in spite of that stipulation to continue the law and motion matters in this county. I know we have discussed this matter, *and it is my desire and [defendant's] desire that law and motion, legal matters, be retained in this county*." (Italics added.)

The court explained, "I believe, gentlemen, as I informed you in chambers, that this can be accomplished. I discussed it with representatives of the Administrative Office of the Courts, and apparently there is a good deal of flexibility. What I will do is take the motion under submission and technically grant it later if I have to in order to process law and motion matters. Otherwise we may be able to make the order subject to continuation of law and motion proceedings here. So the motion is taken under submission. I will notify the Judicial Council that I desire the transfer of the action, and see what other courts are available . . . ."

■ A few days later (Sept. 29, 1978) another hearing was held. The court informed counsel of the various options and it was decided that Lake County would be the preferable alternative forum. The court stated, "I will notify the Administrative Office of the Courts that I propose to transfer the matter to Lake County. And we will determine then by subsequent exploration whether there are any factors which we do not know of which make that undesirable. At least at this stage we will open direct contact with Lake County Superior Court and determine any limitations that they might have in trying the case which would affect our decision. And of course it is possible to come back and still make another choice if that investigation reveals factors which would militate against going there."

Over seven months later, the prosecution asked when the matter would be transferred to Lake County. The court answered, "Well, it is primarily up to you gentlemen. I rely on you gentlemen as to when the balance point is reached so it is more convenient for you and everybody else to be down there rather than up here . . . ."

The pretrial appellate court proceedings in defendant's case were not finalized for another 11 months—until March 1980. The court then asked counsel whether, in light of the delay, a new list of possible trial locations should be obtained from the Administrative Office of the Courts. Both defense counsel and the prosecution agreed that another location should be considered. In mid-March, it was decided that Yolo County would be the new trial location. In mid-April 1980, the court formally granted the motion and transferred the matter to Yolo County.

Defendant argues his venue motion was granted on September 29, 1978. He insists the Shasta Superior Court lacked jurisdiction to rule on any matters after that date, and that "all matters, orders or rulings thereafter" in the Shasta or Yolo Superior Courts were "void." Defendant's premise is faulty: the Shasta Superior Court did not grant the venue motion until mid-April 1980. Accordingly, we find defendant's claim meritless.

■ Defendant maintains, however, that the trial court was required to rule on the venue motion immediately. He cites *Moore* v. *Powell* (1977) 70 Cal.App.3d 583, 587 [138 Cal.Rptr. 914], for the proposition that the trial court lacked power to rule on any other issue prior to deciding the venue motion. *Moore,* however, is distinguishable because it involved civil change of venue under the Code of Civil Procedure, not criminal venue change pursuant to the Rules of Court.

Rule 840 of the California Rules of Court provides that "Rules 840 to 844, inclusive, shall govern the transfer of criminal actions or proceedings."

Motions for change of venue pursuant to section 1033 fall within this rule. (See Cal. Rules of Court, rule 841.) Rules 840 through 844 are silent as to when a trial court must rule on a criminal venue motion; they provide simply that once the transfer is ordered, "the clerk shall immediately make out and transmit to the court to which the action is transferred a certified copy of the order of transfer record, pleadings and proceedings in the action including the undertakings for the appearance of the defendant and of the witnesses." (*Id.,* rule 843.) We conclude the Rules of Court did not prohibit the trial court from taking the venue motion under submission and determining other pretrial motions.[8]

## B. *The Suppression Motion*

Defendant's motion to suppress evidence of various statements he made to the police, and certain other evidence, was granted in part and denied in part. He now challenges the court's failure to grant his suppression motion in its entirety. We conclude the court did not err in its partial denial of defendant's motion.

### 1. *The suppression hearing*

At the suppression hearing, the trial court excluded the statements made by defendant on August 24 following his arrest at the Oarlock Bar, including his tape-recorded confession to Detective Brewer and the 45-page transcript of that confession. It also suppressed the rifle seized from defendant's mother's house. Defendant complains that the trial court failed to suppress: "1. The statements made . . . on August 23, 1978, at the police station (before and after the polygraph examination); 2. Items of property taken in the search of [defendant's] residence on August 24, 1978; 3. Items of [defendant's] property taken from a friend's automobile without a warrant; 4. Items of [defendant's] personal property obtained pursuant to a search warrant on August 25, 1978; and, 5. Items of property taken from [defendant's] person on September 9, 1978, pursuant to a search warrant."

Defendant additionally challenges the trial court's failure to suppress: "1. [Defendant's] admissions/confessions made to Detective Lambert on August 31, 1978, September 6, 1978, September 9, 1978, November 28, 1978, November 29, 1978, and December 11, 1978; and, 2. [Defendant's] admissions/confessions to Lieutenant Philip Eoff on August 26, 1978, August 28, 1978, August 29, 1978, and September 6, 1978. [¶] Nor did it order sup-

---

[8] We note that in 1983 section 1033 was amended to provide, "When a change of venue is ordered by the superior court, it shall be for the trial itself. All proceedings before trial shall occur in the county of original venue, except when it is evident that a particular proceeding must be heard by the judge who is to preside over the trial." (§ 1033, subd. (a).)

pressed [defendant's] statements to certain acquaintances and/or friends made by [defendant] on August 23, 1978, after he left the police station (having completed the polygraph test) and up to the moment of his arrest."

### 2. *Discussion*

The thrust of defendant's argument appears to be that "all of the statements and confessions made by [defendant] were produced by the inherently coercive tactics of law enforcement officers." We analyze each item separately, and conclude that the evidence was properly admitted.

■ a. *Statements of August 23.* Defendant challenges the admission of statements made before and after the polygraph examination of August 23. Defendant neglects to provide record citations and our independent review of the record has failed to disclose any admissions made before the polygraph examination. Further, trial counsel did not seek to suppress any prepolygraph examination statements. Accordingly, we address only the postpolygraph examination interview.

As noted, defendant was read (and he waived) his *Miranda* rights (*Miranda, supra,* 384 U.S. 436) before taking the polygraph examination. He also waived his *Miranda* rights regarding the polygraph examination itself. Defendant argues that once he failed the polygraph test he was entitled to new advisement of his rights. We disagree. We note at the outset that the postexamination interview was not tantamount to a custodial interrogation. On more than one occasion during the posttest interview, defendant stated he was going to leave but Detective Brewer asked him to stay and discuss the case. At no time did Brewer prevent defendant from leaving. Brewer simply asked defendant to "stay and explain what you're talking about." When defendant decided to terminate the discussion, he did not say he wanted to leave; rather, he physically stood up and left.

But even assuming a custodial interrogation, defendant validly waived his *Miranda* rights and the police could constitutionally conduct postexamination questioning "unless the circumstances changed so seriously that his answers no longer were voluntary, or unless he no longer was making a 'knowing and intelligent relinquishment or abandonment' of his rights." (*Wyrick* v. *Fields* (1982) 459 U.S. 42, 47 [74 L.Ed.2d 214, 218, 103 S.Ct. 394].)

■ Defendant emphasizes he "was confronted with the fact that his answers indicated deception" as the basis for requiring "fresh" warnings. The *Fields* court, in reversing a lower court ruling, rejected a similar argument stating, "[t]he Court of Appeals relied on two facts indicating the need

for a new set of warnings: the polygraph examination had been discontinued, *and [the defendant] was asked if he could explain the test's unfavorable results.* To require new warnings because of these two facts is unreasonable. Disconnecting the polygraph equipment effectuated no significant change in the character of the interrogation. The [interviewing] agent could have informed [the defendant] during the examination that his answers indicated deceit; asking [the defendant], after the equipment was disconnected, why the answers were bothering him was not any more coercive. The Court of Appeals stated that there was no indication that [the defendant] or his lawyer anticipated that [the defendant] would be asked questions after the examination. But it would have been unreasonable for [the defendant] and his attorneys to assume that [the defendant] would not be informed of the polygraph readings and asked to explain any unfavorable result." (*Fields, supra,* 459 U.S. at p. 47 [74 L.Ed.2d at pp. 218-219], italics added.)

We note that the defendant in *Fields* received a slightly different set of warnings from those given to the present defendant; Fields was expressly informed that he had "a right to stop answering questions . . . even if [he] sign[ed] a waiver certificate." This, however, does not affect the reasonableness of the assumption that defendant would be informed of the test results and questioned about his responses. Defendant voluntarily submitted to the polygraph examination; he was twice informed of his rights and waived them. Under these facts, we cannot fault the police for informing defendant of the results of the test and for requesting explanations.

■ Nor do we agree that defendant was invoking his right to terminate the interview when he expressed the desire to leave. Defendant was aware of his rights; he was free to invoke his rights and terminate the interview at any time. Defendant was also free to leave at any time, and indeed ultimately did so. On these facts we conclude that defendant was disclosing merely the desire to postpone the interview, not to terminate it.

■ Even if we were to assume error, we would find it clearly harmless. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) It appears that the only incriminating statement defendant made in the interview after the first polygraph examination was that he rode his street bike on dirt roads. Defendant provides record citations to no other incriminating statements, and our review of the record discloses none. In light of defendant's subsequent admissions and confessions, the admission of defendant's posttest statement could not have affected the verdict.

■ b. *Defendant's admissions to friends after the polygraph examination.* After the polygraph test, defendant met with friends and admitted

that he had murdered the two women whose bodies were found at the Igo dump. Defendant contends that his "persistent encounters with various police officials were 'motivating' factors for [his] later confessions to his acquaintances/friends." He relies on *People* v. *Johnson* (1969) 70 Cal.2d 541 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366], to support his claim. *Johnson* is distinguishable; it simply applied the well-established rule, "Where an accused makes one confession and then testifies or upon subsequent questioning again confesses, it is presumed that the testimony or second confession is the product of the first." (*Id.,* at p. 547.) Defendant in this case did not confess to anything during the postexamination interview; nor was his confession to his friends the product of subsequent police interrogation. Defendant voluntarily admitted to his friends that he murdered the two women found at the Igo dump. We agree with the trial court that the admissions were not the product of illegal police conduct.

■ c. *Search of the car (August 24).* After obtaining the confession, Detective Brewer returned with defendant to the Oarlock Bar and, with the consent of defendant and the vehicle's owner, entered the car and seized defendant's personal property. Defendant challenges this search as tainted by his previous confession to Brewer found inadmissible by the trial court. On this record, we are uncertain of the precise timing of the consent. If, as the record suggests, defendant consented to the search before making the suppressed confession, there is no taint. If, however, defendant consented to the vehicle search after he confessed, the consent is tainted and the search invalid.

Assuming the latter, the evidence was nonetheless properly admitted because it would inevitably have been discovered. (*Lockridge* v. *Superior Court* (1970) 3 Cal.3d 166, 170 [89 Cal.Rptr. 731, 474 P.2d 683].) The police knew defendant had confessed to his friends that he had murdered two women; they found defendant in the Oarlock Bar parking lot and learned, before placing him under arrest, that he had personal property inside a certain vehicle. When defendant was placed under arrest, an officer remained behind to guard the vehicle. On these facts, the evidence in the car would have been discovered even without defendant's consent. The trial court therefore did not err in ruling the evidence admissible.

d. *Search of defendant's residence (August 24).* Defendant gave written consent for a search of his residence. This search is also challenged on the basis that it was tainted by the suppressed confession to Detective Brewer. Again we are uncertain of the timing of the consent. Deputy Public Defender Swartz met with defendant in the early morning hours of August 24, before the police arrived. If defendant consented to the search of his residence after speaking with Swartz, the taint was arguably attenuated.

(*People* v. *Sesslin* (1968) 68 Cal.2d 418, 428 [67 Cal.Rptr. 409, 439 P.2d 321] ["That degree of 'attenuation' which suffices to remove the taint from evidence obtained directly as a result of unlawful police conduct requires at least an intervening independent act by the defendant or a third party which breaks the causal chain linking the illegality and evidence in such a way that the evidence is not in fact obtained 'by exploitation of that illegality.' "].) On the other hand, if defendant consented to the search after the suppressed confession but before meeting with counsel, then the consent was tainted.

Again, however, the evidence would inevitably have been discovered. Defendant was under arrest for murder. If he had not consented to a search of his residence, a warrant would have been sought and, on the basis of the information provided by defendant's friends, would have been obtained. The evidence thus would have been discovered even without defendant's consent. Accordingly, the trial court did not err in finding the evidence admissible.

■ e. *Blood and hair samples.* On August 25, blood and hair samples were taken from defendant pursuant to a search warrant. Defendant challenges the warrant, claiming it was based entirely on statements made during the suppressed confession to Brewer. We agree that the affidavit relied on statements made during that interrogation. We conclude, however, that defendant has failed to establish prejudice because the evidence would inevitably have been discovered.

It is undisputed that hair and blood samples could have been obtained pursuant to a valid warrant based on defendant's admissions to his friends. In connection with the Selix murder, the affidavit could have detailed the incriminating evidence discovered during the consent search of defendant's residence. At the very least, the samples could have been obtained following defendant's subsequent admissions. Thus, the error was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711].)

■ f. *Defendant's admissions to Eoff and Lambert.* Defendant challenges several admissions made to Eoff and Lambert between August 26 and December 11. He insists that these statements were "the direct product and result" of illegal police interrogation.

The record, however, shows that defendant freely spoke and confessed his crimes to anyone who listened to him. Before his arrest, defendant admitted to his friends that he had murdered the two women he claimed to have found at the Igo dump. The friends notified the police and defendant was

arrested. He then admitted that he murdered three women in the Shasta County area.

After accepting Swartz as his attorney, and having been specifically and repeatedly instructed not to talk to the police, defendant initiated several conversations with Lieutenant Eoff and Detective Lambert. Both officers told defendant repeatedly that they were not at liberty to discuss his case; defendant nonetheless volunteered information. Indeed, even *after* speaking with his attorney, defendant voluntarily gave Eoff a tape-recorded statement, as well as a handwritten list of all the crimes he had committed. ▮ The fact that defendant, soon after consulting his attorney, told Eoff he still wished to talk to him clearly constitutes "an intervening independent act by the defendant" and purges any taint from the initial suppressed confession. (*Sesslin, supra,* 68 Cal.2d at p. 428.) ▮ We therefore find meritless defendant's claim that his various oral and written admissions to Eoff and Lambert should have been excluded.

▮ g. *Teeth impressions.* On September 8 and 9, teeth impressions were obtained from defendant pursuant to a warrant. Defendant makes the same challenge to this warrant, claiming it was based entirely on statements made during the suppressed confession. We disagree. By September 8, defendant had already given the admissible confessions previously discussed. The information set forth in the affidavit had thus been established by a source independent of the initial, suppressed confession. (See *Nix* v. *Williams* (1984) 467 U.S. 431, 441-448 [81 L.Ed.2d 377, 385-390, 104 S.Ct. 2501], and cases cited.) The search was therefore lawful.

### III. GUILT PHASE ISSUES

*A. Sufficiency of the Evidence*

▮ Defendant alleges there is insufficient evidence of planning to support his first degree murder convictions. He claims that he murdered Edwards, Slavik and Selix "in a fit of anger or rage."

▮ In reviewing the sufficiency of the evidence our inquiry is limited to whether " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], quoting *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 572-573, 99 S.Ct. 2781], italics in original.) We view the evidence in the light most favorable to the judgment below, and we " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Johnson, supra,* 26 Cal.3d at p. 576, quoting *People* v.

*Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659].) ▉ Viewing the evidence in this light, we find it sufficient to support the convictions.

First, defendant's first degree murder conviction in count I was based on felony murder, not premeditated murder, and the evidence established that defendant raped and then killed Edwards. With respect to the murder of Slavik, the evidence showed that defendant lured her out of the bar and drove her to the Igo dump. There she was stripped, raped, and then shot at close range while she was sitting on the ground. With respect to the murder of Selix, the evidence tended to show that defendant picked her up in Cottonwood and drove her to his house, where he raped and sodomized her, and that he then drove her almost 35 miles and threw her off a 105-foot high bridge. We believe the evidence supports the jury's finding of premeditation and deliberation in the murders of Slavik and Selix.

### B. *Alleged Conflict of Interest*[9]

▉ When defendant was arrested, Robert Baker was the District Attorney of Shasta County. After Baker was defeated in the 1978 election, he was retained as a special prosecutor to complete this case. In mid-January 1979, Baker shared office space with Mr. Werner Ahrbeck, a criminal defense attorney. Ahrbeck later became cocounsel for defendant. Defendant now asserts that these circumstances constituted a conflict of interest and denied him a fair trial.

During a discussion in chambers, both defense counsel (Swartz and Ahrbeck) informed Shasta Superior Court Judge Small of the office-sharing arrangement. Although Ahrbeck and Baker shared office space, they were not in business together and each kept his files in separate, secured areas. Defense counsel explained they had discussed the matter with defendant, and that he had no objection. Thereafter, in open court, defendant was informed that the only relationship between Baker and Ahrbeck would be that of landlord and tenant. Judge Small asked defendant if he had any objection to this arrangement, and defendant answered that he had none.

Defendant claims his waiver was invalid because Ahrbeck was unable to give him neutral advice. This overlooks the fact that *Swartz* was defendant's lead counsel, and Swartz's advice on the waiver was in no way affected by

---

[9] On this and the following "shackling" issue, we granted defendant's application to settle the record, and we have incorporated that settled statement into the record on appeal. (See *People* v. *Gzikowski* (1982) 32 Cal.3d 580, 584-585, fn. 2 [186 Cal.Rptr. 339, 651 P.2d 1145]; Cal. Rules of Court, rules 7(d), 12 & 36(a).)

the purported conflict of interest between Ahrbeck and Baker. We see no basis on which to conclude defendant's waiver was invalid.

In addition, Swartz was well aware of the office arrangement and found no basis for objecting to it. Ahrbeck kept none of his files on defendant's case in the "shared" office. Indeed, the record shows the space he shared with Baker was simply a branch office, where he spent little time. Further, the trial took place in Yolo County, which provided the prosecutors and defense counsel separate offices in Woodland. We therefore fail to see how defendant could have been prejudiced by the fact that Ahrbeck and Baker shared office space. Although this practice is not to be encouraged, on these facts we perceive no basis for reversal. (See *People* v. *Marshall* (1987) 196 Cal.App.3d 1253, 1256-1259 [242 Cal.Rptr. 319].)

C. *Shackling*[10]

■ Defendant complains that he was handcuffed[11] and shackled throughout the trial, and that reversal is required under *People* v. *Duran* (1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]. In *Duran,* we "reaffirm[ed] the rule that a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*Id.* at pp. 290-291, fn. and citations omitted.)

Before jury selection began, Judge Warren K. Taylor inquired of his bailiff whether, in light of defendant's size and the seriousness of the charged offenses, special security measures should be employed during the trial. Thereafter, the court summoned counsel and announced its plan to seat defendant between his two defense attorneys at the counsel table and shackle defendant in ankle chains and with handcuffs attached to a "belly chain."

Defense counsel objected to both the described seating arrangement and the shackling of defendant: counsel wanted to sit next to each other in order to confer during trial, and counsel objected that defendant's appearance in shackles would prejudice the jury. Defense counsel represented to the court, and the prosecution agreed, that defendant had not misbehaved, nor had he otherwise posed a security risk, during his pretrial incarceration or his many court appearances in Shasta County before transfer of the matter to Yolo County.

---

[10] See footnote 9, *ante.*

[11] As explained below, the record does not support defendant's claim that he was hand-cuffed while in the courtroom.

Following additional discussion, the court approved a procedure permitting defendant to be seated at the end of the defense counsel table, next to Mr. Swartz. For the safety of the court clerk, a lectern was to be placed between the counsel table and the court clerk's desk. The court also ordered that defendant would not be handcuffed, but that he would be shackled with ankle chains, and that the counsel table would be equipped with a "skirt" to prevent the jurors from observing the shackles. Furthermore, pursuant to an agreement among all counsel, the bailiffs were directed to transport defendant to court sufficiently in advance of the jury's arrival in order to prevent jurors from observing that defendant was handcuffed and shackled. The agreed-on procedures also called for defendant to remain in the courtroom until after the jurors had departed the courthouse. Pursuant to the court's instructions, the jurors normally remained in the jury room during court breaks.

The holding cell adjacent to the courtroom was not equipped with restroom facilities. In order to use nearby facilities, defendant was escorted in leg restraints within view of jurors who happened to be in the hallway or using the men's room. On at least one occasion a male juror observed defendant in the men's room wearing shackles. Occasionally some of the jurors had the opportunity to observe defendant escorted from the courtroom and the jail building wearing leg restraints and handcuffs.

No objection was made to these transportation procedures, nor was there any objection during trial that the protective skirt around the counsel table was inadequate or that the jurors could observe that defendant was seated in the courtroom in leg restraints.

It may be argued that, at least as of the time of the court's ruling, the record does not establish a "manifest need" for restraints. (See *Duran, supra,* 16 Cal.3d at pp. 290-291; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1261-1264 [232 Cal.Rptr. 849, 729 P.2d 115], and cases cited.) Even assuming an abuse of discretion is shown, however, and assuming the issue is preserved in light of defense counsel's failure to object further, at most the record establishes what we characterized in *Duran,* as minor and nonprejudicial error. In *Duran,* we found prejudice because the defendant's credibility as a witness had been damaged by the shackles. We noted, however, that "the case . . . does not involve a situation wherein the defendant was seen in shackles for only a brief period either inside or outside the courtroom by one or more jurors or veniremen. [Citation.] Such brief observations have generally been recognized as not constituting prejudicial error." (*Id.,* at p. 287, fn. 2; see also *People* v. *Cecil* (1982) 127 Cal.App.3d 769, 777-779 [179 Cal.Rptr. 736].)

We conclude that even assuming the jurors at times briefly saw defendant being escorted in shackles and handcuffs to the courtroom or the restroom, defendant was not prejudiced thereby. The record does not indicate the jury saw defendant's shackles during the trial proceedings. On the facts of this case, any such error must be deemed harmless.

### D. *Disclosure of Defense Psychiatric Information*

In mid-October 1980, the defense released to the prosecution the videotapes of defendant's hypnotic narcoanalysis sessions. Dr. Axelrad, one of the defense psychiatrists, had performed these interviews and had relied on the videotapes—17 hours in length—in formulating his expert opinion of defendant's mental state. The prosecution viewed the tapes and returned them. A few days later, Dr. Axelrad testified for the defense. He stated that he had selected excerpts from the videotapes for the jury to view; the excerpts totaled nine hours. One of defendant's counsel informed the court that he wished to begin showing the tapes that afternoon and noted, "I would further indicate, of course, that Mr. Baker has had the opportunity to observe the total of the tapes and that if he feels that anything was left out that should be in, he can put [it] in." A recess was taken and the matter was discussed outside the presence of the jury.

Defense counsel informed the court that Dr. Axelrad had been given the tapes that the prosecution had viewed, and that he edited them to about nine hours by copying the excerpts from the originals so that the original videotapes remained intact. The prosecutor complained that he had not seen the edited version and argued that the tapes should be shown in their entirety. Defense counsel responded that he had seen the edited tape and that in his opinion, the edited tape was "balanced." Defense counsel also pointed out to the court that the originals were "still available for [the prosecution's] use in any manner they choose." The court dismissed the jury for the day to give the prosecution time to review the edited version of the tapes.

The edited version was then shown to the jury. At the same time, the prosecution requested the originals so that they could be shown to the prosecution expert for rebuttal purposes. Defense counsel objected. He acknowledged that the prosecution had a right to show the entire 17 hours of videotape to the jury but stated, "Our objection is that we do not feel that we are obligated now to begin turning over the tapes or provide them with copies not for purposes of cross-examination or to submit the rest of them to the jury, but to prepare their own expert witness contrary to the defendant's position." The matter was taken under submission.

At a subsequent hearing, the defense asserted that turning over the tapes implicated defendant's privacy and self-incrimination rights. The court rejected defendant's claim, noting that the prosecution's demand was "reasonable and pertains to a particular defense offered by the defendant, that is, his mental state," and that it related to "information that has been developed and offered at the trial by the defendant which does not provide an essential link" in the prosecution's case, but was merely "a reaction to a defense offered by the defendant."

We reject defendant's claim that the court's order violated his privilege against self-incrimination. Defendant had previously allowed the prosecutor to view the original tapes in their entirety and the prosecution expert could have also viewed them at this time. Defendant thus waived any privacy or self-incrimination rights he had in the tapes. To hold otherwise would be to elevate form over substance and would require the prosecution to duplicate every evidentiary item turned over for inspection.

In addition, we believe the prosecutor would have been entitled to the tapes even if defense counsel had not previously allowed him to view them. By placing into evidence an edited version of the hypnotic narcoanalysis sessions, the defense gave the prosecutor the right to play the complete set of tapes for the jury. ██ (See Evid. Code, § 356.)[12] A prosecution expert could have simply viewed the tapes from the audience. It is also clear that the prosecution had the right to cross-examine Dr. Axelrad about the tapes. (See *id.*, § 721, subd. (a); see also *id.*, § 771.) Moreover, because of the technical nature of the subject matter, the prosecutor was entitled to have his own expert explain the tapes to him so that he could effectively cross-examine Dr. Axelrad.

 We have recognized that "the principal element in determining whether a particular demand for discovery should be allowed is not simply whether the information sought pertains to an 'affirmative defense,' or whether defendant intends to introduce or rely upon the evidence at trial, but whether disclosure thereof conceivably might lighten the prosecution's burden of proving its case in chief. Although the prosecution should not be completely barred from pretrial discovery, defendant must be given the same right as an ordinary witness to show that disclosure of particular information could incriminate him." (*Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320, 326 [85 Cal.Rptr. 129, 466 P.2d 673], fn. omitted; see *In re Misener* (1985) 38 Cal.3d 543, 548 [213 Cal.Rptr. 569, 698 P.2d 637].) The tapes here, however, in no way lightened the prosecu-

---

[12] A videotape is a "writing" within the meaning of Evidence Code section 250. (*People* v. *Moran* (1974) 39 Cal.App.3d 398, 406-411 [114 Cal.Rptr. 413].)

tion's burden; the prosecutor had already completed his case-in-chief, relying on defendant's confessions to the police and to his friends, and on the testimony of the surviving rape victims, to prove that defendant was responsible for the crimes charged. The defense conceded that defendant had indeed committed the crimes but argued he was insane at the time. The prosecutor then sought to respond to this claim. Such use of the tapes could not have made it easier for the prosecution to prove its case-in-chief.

## E. *Alleged Prosecutorial Misconduct*

Defendant claims numerous instances of prosecutorial misconduct throughout the trial. Of the numerous claims, only four were the subject of a timely objection in the trial court. (*People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].)

### 1. *Assertions of misconduct to which defendant objected at trial*

We turn first to those four situations in which trial counsel objected below. Our review of the record reveals there was no misconduct.

■ a. *Talking with witnesses in the hallway.* After the first day of trial, defense counsel complained to the court that the prosecutor was meeting with witnesses in the hallway frequented by the jurors because the jury room was being used by a different jury. It appears that the jury could hear the prosecutor and the witnesses talking, but could not specifically hear what was being said. The court advised the prosecutor to be "cautious about interviewing witnesses in the corridor" and later asked the jury to try to stay out of the hallway. Trial counsel apparently saw no need to bring the matter to the court's attention again. We cannot conclude that misconduct occurred.

■ b. *Qualifications of a witness.* Trial counsel objected to the testimony of witness Adolph Goehring on the ground that he was unqualified to testify about sperm counts and acid phosphatase testing. Goehring, a medical technologist and toxicologist, was the clinical administrator of Northern Laboratories; he had been trained in both acid phosphatase testing, and sperm identification and analysis. The court ruled that defendant's complaints "[went] to the weight of the testimony rather than to its admissibility" and denied the motion to strike Goehring's testimony. Defendant renews this claim on appeal. We agree that, in light of Goehring's training, he was a competent witness. The fact that Goehring said he was not qualified to answer certain questions, such as the life expectancy of sperm cells following the death of a rape victim, in no way reflects on his ability to test for the presence of sperm and acid phosphatase. The court correctly ruled

that any such deficiencies went to the weight of Goehring's testimony and not its admissibility.

 c. *Questioning of Dr. French.* After Dr. Axelrad testified for the defense, Dr. French was recalled as a prosecution rebuttal witness. He was asked to comment on Dr. Axelrad's report. Trial counsel objected on the ground that the report was not in evidence. The prosecutor responded that Dr. Axelrad had already testified and that he wanted Dr. French to comment on what Dr. Axelrad said in his report. Trial counsel conceded that comment on Axelrad's testimony was appropriate, but questioned whether comment on the report was equally appropriate. The court noted that there had been "many references to the report during the course of the trial" and overruled the objection. A prosecutor is not guilty of misconduct when he questions a witness in accordance with the court's ruling.

 d. *Questioning of Dr. Axelrad.* During cross-examination, the prosecutor questioned Dr. Axelrad about the large number of cases in which he had testified for the defense that various defendants were insane or suffered from diminished capacity. We reject defendant's claim that this constituted prosecutorial misconduct, because it is proper to elicit testimony tending to show bias. (Evid. Code, § 780, subd. (f).) Defendant also claims that "Dr. Axelrad was improperly questioned over [defendant's] objection concerning a brief submitted by the American Psychiatric Association in [an unrelated] case." After Dr. Axelrad admitted he was aware of the brief in question, the prosecutor asked him about the contents of the brief. Defense counsel objected on the grounds that Dr. Axelrad had not said he was familiar with the contents of the brief. Because further questioning disclosed that Dr. Axelrad was not familiar with the brief's contents, the court refused to allow the prosecutor to question him about it. Thus, Dr. Axelrad was *not* questioned over objection; the objection was sustained, and no misconduct occurred.

2. *Assertions of misconduct to which defendant did not object below*

Defendant asserts his failure to object to various other instances of asserted misconduct does not bar review on appeal because, he claims, in each instance a timely objection and admonition would not have cured the asserted "harm." (See *People* v. *Green, supra,* 27 Cal.3d at p. 28.) As to each point, we disagree. Moreover, we find no misconduct in any event.

 a. *Remark about defendant's hospital interview with defense psychiatrists.* During guilt phase closing argument, the prosecutor recounted the defense experts' testimony. At one point, while discussing the questions

defense psychiatrists asked defendant, the prosecutor said, "I was thinking in watching those videotapes that we watched for [three days], 'Boy, I wish I had been in that hospital with [defendant] and asked him a few questions myself because there were some questions to ask him with respect to his conduct.' I am going to get into that a little more specifically later, but you have this attitude by [defense psychiatrists], this patronizing attitude, toward [defendant] where he can do absolutely no wrong and say anything he wants to and is believed carte blanche."

A short while later, court recessed for the evening. Out of the presence of the jury, the court stated, "I want to comment on a remark you made during your argument, Mr. Baker, when you said, 'Boy, I wish I could have been in that hospital room asking him questions.' I think the major purpose of that argument is understandable and acceptable, but I invite your attention to the fact that it might also be interpreted as a comment on the defendant's failure to testify and you indicated you were going to go into this in more detail in the future and I want you to bear in mind that problem if you go into that." The prosecutor responded that he intended to argue, "Why didn't [the psychiatrist] ask [defendant] this? Why didn't he ask him that?"

In the context of the entire argument, only a portion of which is quoted above, it is clear that the prosecutor was not commenting on defendant's refusal to testify, but on the defense psychiatrists' failure to ask certain probing questions. The thrust of the prosecutor's argument was that the defense psychiatrists were biased or otherwise untrustworthy. We therefore reject defendant's claim that the prosecutor impermissibly commented on his refusal to testify. ▮▮ ▮▮▮▮▮ In any event, any prejudice would have been cured by a timely objection and admonition.[13]

▮▮ b. *Remark about victims' families.* The prosecutor stated during both guilt and penalty phase closing arguments, "[w]hen you think of Christmas time coming now, think of these families. These people are gone forever." We doubt this amounts to error under *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529]. As we noted in *People* v. *Ghent* (1987) 43 Cal.3d 739, 771-772 [239 Cal.Rptr. 82, 739 P.2d 1250], *Booth* involved formal presentation of "victim impact *evidence,*" and is hence distinguishable from a case such as this, involving mere argument. (See also *People* v. *Miranda* (1987) 44 Cal.3d 57, 112-113 [241 Cal.Rptr. 594, 744 P.2d 1127] ["*Booth* . . . is patently distinguishable"].) In any event, any "error" at the guilt phase would be harmless because the jury

---

[13] We also reject defendant's claim that trial counsel were incompetent for failing to object to the prosecutor's statement. We believe counsel realized that the prosecutor was commenting on the psychiatrists' shortcomings, not defendant's failure to testify.

was instructed not to be swayed by passion or sympathy in deciding defendant's guilt (CALJIC No. 1.00), and the jury is presumed to have followed that instruction (see *People* v. *Chavez* (1958) 50 Cal.2d 778, 790 [329 P.2d 907]). Nor can we conclude that, on the facts of this case, the prosecutor's argument at the penalty phase amounted to reversible error. (*Ghent, supra,* 43 Cal.3d 739; *Miranda, supra,* 44 Cal.3d 57.)

 c. *Comment on rape victim's recovery.* The prosecutor stated during closing argument, "And I was very touched when [rape victim Kelly M.] said, 'I think I am doing very well in forgetting.'" We find nothing objectionable in the statement. It constituted nothing more than "vigorous argument" under *People* v. *Fosselman* (1983) 33 Cal.3d 572, 580 [189 Cal.Rptr. 855, 659 P.2d 1144].

 d. *Reading from a report not in evidence.* The prosecutor read from a psychiatrist's report not admitted into evidence. The statement read from the report, however, had already been brought out at trial. During cross-examination of Dr. Axelrad, the prosecution pointed out that, with respect to the nonmurder offenses, Dr. Axelrad's report concluded that "defendant did not lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." The prosecution then had Dr. Axelrad read the material sentence from his report into the record. In closing argument, the prosecutor read the same sentence from the report. The relevant portion of the report was therefore in evidence and thus was properly reread to the jury.

 e. *Comment about psychiatry.* Defendant notes that during guilt phase closing argument, the prosecutor stated, "If you need a psychiatrist to say the person is crazy, he ain't crazy." The statement arose in the following context: The prosecutor argued to the jury that defendant's psychiatrists were biased. Specifically, he claimed that Dr. Axelrad failed to ask a number of questions that would have helped determine defendant's ability to appreciate the criminality of his conduct. The prosecutor asserted Dr. Axelrad failed to ask these questions because he was "going for a goal," i.e., he was seeking only information which would establish that defendant did not appreciate the criminality of his conduct.

The prosecutor then told the following story: "I went to a meeting one time, a murder seminar, in Los Angeles and there was a debate over the validity of psychiatry in the courtroom, forensic psychiatry in the first place. There was an argument between a psychiatrist, who is a forensic psychiatrist, and a psychologist, who is also a lawyer. He was taking the anti-role, the con-role, it shouldn't be allowed in the courtroom, and made a statement, 'If you need a psychiatrist to say the person is crazy, he ain't

crazy.' [¶] Look at the objective signs exhibited by [defendant] at all times during this case." The prosecutor then detailed prior psychiatric examinations of defendant.

The thrust of the prosecutor's argument, and the purpose behind the story, was that the jury should "use [its] own common sense." He pointed out that "Dr. Axelrad on cross-examination ha[d] a logical alternative explanation for everything. I asked him, '[w]asn't the most logical reason for pulling [Kelly M.'s] head down so she wouldn't know where she was going or where she had been?' He said, '[w]ell, it could be an exhibition of power or to control.'" We conclude the prosecutor was simply attempting through proper, vigorous argument, to minimize the jury's reliance on Dr. Axelrad's testimony and opinion.

■ f. *Reference to defendant's reading DSM III*. During guilt phase closing argument the prosecutor stated, "I think you can take your observations of [defendant] during this trial too into consideration. I mean, he has been reading DSM [Diagnostic and Statistical Manual] III over here. He has been writing things down. This is not a person that lacks mental capacity." Defendant complains that the reference to reading DSM III "was unfounded, because twice objections were sustained to two of his trial questions to Dr. Satten regarding [defendant] doing considerable reading of DSM III."

Defendant misreads the record. During cross-examination of Dr. Satten, the following colloquy took place: "Q. Okay. I believe [defendant] indicated to you that he had read Dr. Axelrad's report prior to at least your second interview? A. Yes. Q. And he also had indicated . . . that he'd read either French's or Kaldor's, or both? A. I believe so. Q. Were you also aware that [defendant] had done [a] considerable amount of reading of the DSM III? MR. SWARTZ: I'd object, your Honor, no evidence to support that contention. THE COURT: I don't recall any testimony in that respect. I'll sustain the objection. Q. BY MR. O'CONNOR: Well, Doctor, . . . hypothetically, if there was evidence that [defendant] had read the DSM III—MR. SWARTZ: I object, your Honor, again. There's no evidence of that. It's not material, it's not an appropriate hypothetical question. THE COURT: I'll sustain the objection."

We believe these questions referred to defendant's reading of DSM III during the time he was being interviewed and experts were forming their opinions as to his capacity. The fact that the objections were sustained in no way affects the validity of the prosecutor's claim that defendant was reading DSM III during trial. The prosecutor asked the jury to consider "your observations" that defendant did such reading, and told the jury not to

"take my word for it." In addition, although trial counsel did not object, counsel did tell the jury during closing argument, "I have sat fairly close to [defendant] during the course of this trial and while he has read many different things, DSM III did not happen to be one of them." Because the jury was directed to rely on its own observations, and because defense counsel argued that defendant had not been reading DSM III, we conclude that, even assuming error, defendant was not prejudiced by the prosecutor's comment.

In a similar argument, defendant asserts the prosecutor's comment must have led the jury to believe that the prosecutor had learned that defendant was reading DSM III while the court was not in session. The record, however, does not support defendant's claim. The prosecutor specifically asked the jury to rely on its own observations.

■ g. *Comment on evidence of premeditation and deliberation.* During guilt phase closing argument, the prosecutor argued that the evidence supported findings of deliberate and premeditated murder. He pointed out that defendant took Slavik to the Igo dump, "to the scene where he had left another body." He had previously argued that Slavik had to have seen Moore's body at the dump because she was only 20 feet from it. The prosecutor then stated, "[a]nd obviously, he takes a gun, he takes ammunition. I have never seen deliberation and premeditation like that." In our view, this is nothing more than a fair comment on the evidence (*People* v. *Beivelman* (1968) 70 Cal.2d 60, 76-77 [73 Cal.Rptr. 521, 447 P.2d 913]) and vigorous argument under *Fosselman, supra,* 33 Cal.3d at page 580.

■ h. *Quote regarding felony-murder rule.* During guilt phase closing argument, the prosecutor said, "Our Supreme Court at one time made a statement about the felony murder rule which I think is appropriate. 'The statute was adopted for the protection of the community and its residents, not for the benefit of the lawbreaker, and this court has viewed it as obviating the necessity for, rather than requiring, any technical inquiry concerning whether there has been a completion, abandonment or desistence of the felony before the homicide was completed.'" Defendant asserts, without explanation, that this is not an appropriate statement of the law. The prosecutor, however, quoted directly from our opinion in *People* v. *Chavez* (1951) 37 Cal.2d 656, 669-670 [234 P.2d 632], and we fail to see how he committed misconduct by reading this passage.

■ i. *Reference to polygraph examination results.* During his opening statement, the prosecutor informed the jury that after the police first questioned him, defendant went to his friends' home and told them he had failed a polygraph examination. On this record, we fail to see how this

amounted to misconduct, or prejudice. Defense counsel also referred to the polygraph test in their opening statement (as proof of their theory that defendant wanted to be caught), and it was later stipulated that the results of the polygraph examinations were admissible.[14]

■ Defendant also alleges it was misconduct for the prosecutor to ask Detective Brewer whether anyone else failed the polygraph examination. The witnesses responded that defendant was the only one to fail such a test. A timely objection would have cured any error. In any event, we perceive no prejudice. Whether anyone else failed the polygraph examination in no way affected the jury's determination of whether defendant wished to turn himself in and whether he was suffering from diminished capacity. Thus, even assuming the evidence was inadmissible, its admission was harmless.

■ j. *Questions about suppressed evidence.* Defendant complains that the prosecutor asked officers about a purse that belonged to one of the murder victims even though the purse had been ordered suppressed. The record reveals that the court ruled the questions proper, and that the prosecutor asked only whether the purse had been found during certain searches. The answers were all negative, and the jury never learned that the purse had been found. We fail to see how the prosecutor's questions prejudiced defendant.

■ k. *Redirect examination of a prosecution witness.* During cross-examination of prosecution witness Hale, defense counsel accused the witness of refusing to talk to an investigator from the public defender's office. The witness, a long-time friend of defendant, denied the charge, explaining, "I was talking to him until he said something I didn't like." On redirect examination, the prosecutor asked the witness what the investigator said. The witness responded, "He said that [defendant] was sick and he did not mean to do what he did. And that's when I stopped talking to him." Defendant fails to explain why this constituted misconduct; the prosecutor simply rehabilitated a witness by allowing him to explain why he stopped talking with the investigator. ■ Furthermore, trial counsel apparently did not object because the evidence was admissible under the state of mind exception to the hearsay rule. The statement was not admitted to prove the truth of the matter asserted—i.e., that defendant was sick and committed the crimes—but to explain the witness's subsequent conduct.

---

[14] In a related claim, defendant asserts his counsel were "forced to waive any objection" to the introduction of the polygraph test results. It appears, however, that counsel stipulated to admissibility of the polygraph results because the fact that defendant volunteered to take the test and the fact that he failed the test supported their theory that defendant wanted to be caught.

Defendant also asserts the prosecutor elicited from the witness that the investigator said defendant "wasn't completely right." Defendant misstates the record; it was the witness's personal opinion that defendant "wasn't completely right."

 *l. Lieutenant Eoff's testimony.* Defendant claims misconduct in eliciting testimony from Lieutenant Eoff concerning defendant's admissions and the written list of crimes defendant gave to Eoff. There was no misconduct because, as we explained above, the evidence was admissible. (*Ante,* p. 1081.)

 m. *Detective Lambert's testimony.* During direct examination of Detective Lambert, the prosecutor asked the witness to explain the significance of the written list defendant had given to Lieutenant Eoff. Detective Lambert explained how each item on the list referred to the location of a particular crime. The list included two crimes with which defendant had not been charged. Detective Lambert said that no one had been charged with those two crimes.

At the conclusion of his testimony, one of the jurors asked the court, "We just had a list here of apparent admissions. Now, not all of them are lined up with the charges involved here. Why is that? I would assume that every one of them would be brought up." The court replied, "I think that has been explained to you by the testimony. But I will add the further statement that sometimes charges can't be proved for various reasons and so they are not made. But we are not involved in that inquiry in this case." Soon thereafter, a stipulation was entered between the prosecutor and defense counsel, and read to the jury: "There are two crimes on the list prepared by the defendant that have not been charged. The two crimes did occur and no one other than the defendant has ever claimed responsibility for these crimes. The jury should not concern itself with the reasons these two crimes were not charged in this case."

If the prosecutor had not asked Detective Lambert to explain every item on the list, the jury might have been confused. Defendant's confession was clearly admissible and the jury was specifically instructed, pursuant to a stipulation in which trial counsel concurred, not to concern itself with the reasons why the two crimes were not charged. We fail to see how this constituted misconduct.

 n. *Use of suppressed confession in cross-examination of defense experts.* Defendant notes the prosecutor referred to the suppressed confession in his examination of the defense psychiatrists. Defense counsel, however, had earlier introduced the confession into evidence because the de-

fense experts had relied on it in reaching their conclusions about defendant. The court specifically instructed the jury that the confession was to be considered "only for the limited purpose of showing the information upon which the medical expert based his opinion." Thus, it was not misconduct for the prosecutor to refer to the confession during cross-examination of defense experts.

o. *Calling court-appointed psychiatrist as rebuttal witness.* During trial, the prosecutor met with Dr. Kaldor, one of the court-appointed psychiatrists. The prosecutor provided the doctor with Dr. Axelrad's report, and asked for his comments. Dr. Kaldor reviewed the report and discussed it with the prosecutor. He then formulated "a number of questions [he] thought would be helpful in talking about this specific area [of hypnotic narcoanalysis] for the jury." Dr. Kaldor was later recalled as a rebuttal witness. Defendant now claims, without case authority, that this constituted prosecutorial misconduct. We have found no authority to support this claim; either party could utilize Dr. Kaldor (a court-appointed psychiatrist) to assist in explaining technical material to the jury.

p. *Calling witnesses by first names.* Defendant complains the prosecutor called some witnesses by their first names. We note that defense counsel did so as well. Indeed, throughout trial they referred to defendant as "Darrell" and to the lead prosecutor as "Bob." In any event, defendant cites no authority precluding a party from calling a witness by his first name, or suggesting prejudicial error results from such a practice. This matter is best left to the sound discretion of the trial court.

q. *Cross-examination of Dr. McCann.* During the prosecutor's cross-examination of Dr. McCann, the witness began describing a test which determined sensitivity to pin pressure on one's wrists. McCann testified that defendant "did it okay on the right hand but he couldn't tell it on his left side." The following colloquy then took place: "A. Without looking at [defendant] right now, can you tell me whether he's right-handed or left-handed? A. I have it written down here because that's one of the things I always ask, 'What hand do you use?' Q. You don't recall? A. No. Q. I think he's left-handed, as a matter of fact. A. I honestly don't know. Q. He writes with his left hand. What do you make of that, Doctor, the fact, assuming he's left-handed? *Are you right-handed, Darrell?* I'm sorry. MR. SWARTZ: It's right on the chart. THE WITNESS: Yes, I put it there. Q. [By prosecutor]: . . . So what do you make . . . of the fact that he scores all right on the right side with his pin business but not so well on the left? A. In and of itself, nothing. . . ." (Italics added.)

Defendant claims this constituted an impermissible reference to his failure to testify. Considered in context, however, the underscored question

apparently represented an innocent mistake; it seems clear that the prosecutor was focusing on whether Dr. McCann could determine, on the basis of the pin-pressure scores, which hand defendant used. Defense counsel quickly directed the prosecutor and the witness to the location of the information they sought and the questioning resumed. We fail to see how the incident could have prejudiced defendant.

### F. *Alleged Ineffectiveness of Counsel*

Defendant submits a lengthy list of claimed instances of ineffective assistance of counsel. Our independent examination of the record convinces us that both of defendant's trial attorneys were competent.

■■ Defendant bears the burden of proving ineffective assistance of counsel. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) He must demonstrate that counsel failed to act with reasonable competence, and that this failure deprived defendant of the opportunity to present a potentially meritorious defense. (*Ibid.*) When the purported failure does not amount to the withdrawal of a potentially meritorious defense, a defendant must establish that counsel "failed to perform with reasonable competence and that it is reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings." (*People* v. *Fosselman, supra,* 33 Cal.3d 572, 584, citing *Pope, supra,* 23 Cal.3d at p. 425, and *People* v. *Watson, supra,* 46 Cal.2d 818, 836; see *Strickland* v. *Washington* (1984) 466 U.S. 668, 693-695 [80 L.Ed.2d 674, 697-698, 104 S.Ct. 2052] [articulating the "reasonable probability" test].) ■■ We will reverse on "ineffective assistance of counsel" grounds "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission." (*Fosselman, supra,* 33 Cal.3d at p. 581.) We conclude that defendant has not met this burden.

### 1. *Stipulation to polygraph results and related testimony*

■■ Defendant claims trial counsel should not have stipulated to the admissibility of the results of the August 23, 1978, polygraph examination. On this record, we believe it reasonable to assume that counsel stipulated to the admissibility of the polygraph results for tactical purposes: defense psychiatrists testified that defendant volunteered to take the examination because he knew he would fail and wanted to be caught. The claim was that defendant wanted to stop raping and killing women, and the only way he could accomplish this was to "expose" himself, to "draw attention" to himself, to "turn himself in." Evidence that defendant voluntarily submit-

ted to a polygraph examination, knowing that he would fail the test, supported the defense theory.[15]

We also note that it is not reasonably probable a more favorable result would have been reached in the absence of the stipulation; defendant's confession to Eoff, combined with the testimony of defendant's friends and with the other properly admitted evidence obtained after defendant's arrest, strongly supported the convictions.

For similar reasons, we reject the claim that trial counsel should have objected to Detective Brewer's testimony that defendant was the only person who failed the polygraph examination. And again, we cannot conclude that this testimony affected the verdict.

## 2. *Defense counsel's closing argument*

■ In light of defendant's confessions, trial counsel were severely restricted in presenting a defense. Contrary to defendant's reading of the record, however, trial counsel did not "throw in the towel" and "recommend" convictions on all nonhomicide charges and verdicts of first degree murder in two or three of the homicide offenses. They necessarily conceded that defendant should be found guilty of the general intent crimes, but they did not concede that defendant should be found guilty of assault with a deadly weapon with force likely to produce great bodily injury—a specific intent crime.

Our review of the record reveals that trial counsel requested the jury to return verdicts of *manslaughter*—not first degree murder—in each of the counts charging defendant with murder. The thrust of the defense was that defendant lacked the requisite intent to commit first degree murder, and that the expert testimony supported such a finding. One of defendant's counsel conceded that the expert testimony would support a finding of first degree murder in the Slavik homicide, but he did not "recommend" such a finding.

The record shows trial counsel merely sought to maintain credibility with the jury. If the jury went "with" counsel, defendant might live. If the jury

---

[15] For example, defense counsel informed the jury during opening argument that "[t]he police did not come to [defendant], [he] came to the police." Counsel also stated: "Evidence will show that [defendant] went in to take that polygraph exam and the evidence will show that [defendant], when he went in to take that polygraph exam, knew that there was a high likelihood that he was not going to be able to pass it. The evidence will show that [defendant]'s subconscious was driving him closer and closer to admitting [the crimes in order] to be stopped." Defense counsel returned to this theme during closing argument, observing that defendant chose to "find" the bodies at the Igo dump and to submit to a polygraph examination rather than stay silent or flee the area.

went "against" counsel, defendant faced the very real possibility of receiving the death penalty. It was therefore a prudent, tactical choice to admit candidly to the jury that it could find defendant guilty of the lesser crimes but argue that the evidence supported verdicts of only manslaughter on the murder charges. We believe the course trial counsel selected provided defendant a reasonable chance to avoid the death penalty. That the plan failed does not render counsel ineffective. (See *People* v. *Jackson* (1980) 28 Cal.3d 264, 290-296 [168 Cal.Rptr. 603, 618 P.2d 149].)

### 3. *Disclosing parts of the suppressed confession*

■ Defendant maintains trial counsel were ineffective for presenting to the jury parts of defendant's suppressed confession to Detective Brewer. Evidently, the defense experts had been provided with transcripts or recordings of that interview, and defense counsel made numerous references to the contents of the suppressed confession during examination of their witnesses. Thereafter, the prosecutor used parts of the confession in his cross-examination of defendant's witnesses, and suggested that defendant's detailed recall of the homicides as demonstrated by the confession, and his initial denial of the Selix murder, were inconsistent with his claim of diminished capacity.

We are unable to conclude that counsel lacked a tactical reason for allowing the jury to hear about certain aspects of the suppressed confession. Indeed, by making various references to that interview, counsel may have managed to support their defense theory that defendant wished to be caught, and to portray defendant in a favorable light.

In any event, however, we are unable to conclude counsel's conduct amounted to prejudicial error. First, we note that neither defendant, nor amicus curiae, specifies what assertedly prejudicial information was thereby presented to the jury; in short, they have not properly presented the claim of error to this court. Second, the jury was specifically instructed to consider both defendant's statements to experts, and his statements to Detective Brewer, for the limited purpose of "showing the information upon which the medical expert based his opinion." Finally, in view of the remaining, properly admitted evidence—including defendant's confession to Eoff—we simply cannot conclude that references by counsel to the Brewer confession could have affected the jury's verdict.

### 4. *Adequacy of sanity phase argument*

■ Defendant asserts trial counsel should have argued at length during the sanity phase of the trial. The sanity phase was submitted on the basis of the record and evidence presented at the guilt phase; no additional evi-

dence was introduced. The evidence that trial counsel presented during the guilt phase spanned approximately seven weeks and covered more than 3,100 pages. Furthermore, trial counsel's guilt phase closing argument ran seven and one-half hours in length.

At the sanity phase, trial counsel argued to the jury as follows: "Thank you. Just a few very brief things to say. Unlike the first phase of this trial where the burden was entirely upon the People to prove each fact and each issue beyond a reasonable doubt, [in] the second phase of the trial, the burden is on us to prove the issue of insanity [by] a preponderance of the evidence. That is much less than beyond a reasonable doubt, the burden the People had in the first phase, and the Court will explain to you in [the] instructions exactly what it is. [¶] You have now heard during the first phase all of the evidence that we had to present. You have heard all the arguments that we had to present to you and it is our request now that you consider the issues presented to you and the evidence presented to you at the first phase in considering the special instructions the judge is going to give you on insanity. Thank you."

On this record, we cannot agree that counsel's decision not to reiterate the extensive guilt phase arguments constituted ineffective assistance.

5. *Shackling of defendant during psychiatric interviews*

▮ Defendant was shackled and accompanied by a police officer during his psychiatric examinations with Dr. French, one of the court-appointed psychiatrists. The record discloses Dr. French expressly requested this procedure and informed the court that he would not interview defendant unless his request was granted. The jury was informed of the procedure and learned that the basis for Dr. French's request was his concern for his personal safety. Trial counsel's decision not to object to the procedure does not constitute ineffective assistance of counsel.

Defendant similarly claims counsel should have attempted to exclude the testimony of Drs. French and Robinson because defendant was shackled during interviews with them and because a police officer was present during the interviews. We believe defendant's concerns go to the weight of the doctors' testimony, not to admissibility. ▮▮▮▮▮ We note that defense counsel emphasized to the jury that defendant was shackled during these interviews and argued that it made defendant uncomfortable and the doctors' evaluations less accurate.[16]

---

[16] Finally, we reject defendant's claim that the presence of an officer during the interview with Dr. French violated defendant's right to counsel. The officer was instructed not to repeat anything he heard during the interview. Defense counsel informed the court that they

### 6. *Testimony of Drs. French and Kaldor*

■ Defendant argues counsel were incompetent for calling Drs. French and Kaldor, both court-appointed psychiatrists, because their testimony was inconsistent with the defense theory of diminished capacity. Defense counsel called Dr. French as their first witness and he admitted that when he interviewed defendant, DSM III had not yet been developed, and that he based his diagnosis on DSM II. Dr. French also admitted, "the data base [I] have today is insufficient for [me] to make a diagnosis with medical certainty under the standards applicable today." The defense called Dr. Kaldor as their second witness, and he too admitted that DSM II was still in use when he evaluated defendant, and that his evaluation of defendant was possibly inappropriate. Counsel also alerted the jury to the fact that Dr. French spent only two hours with defendant and Dr. Kaldor only four hours, and argued that the interviews were tainted because police were present and defendant was shackled. Defense counsel then presented numerous lay witnesses before putting their own experts on the stand.

During guilt phase closing argument, the prosecutor argued, "I am sure [defense counsel] called [Dr. French and Dr. Kaldor] just to take the sting out of our case. They wanted to take the sting out of these witnesses before we put them on the witness stand." Defense counsel responded, "[w]e had grave misgivings about the standard and the information that they had available to them and we put them on first to show you that fact and then to produce all of the information we have produced [subsequently] in the courtroom which could then be utilized by Drs. French and Kaldor in an opinion on rebuttal, which we [knew would take place]."

In our view, defendant challenges trial tactics, not competence of counsel. It might well have worked against the defense if its own experts testified defendant was insane whereas the court-appointed experts in rebuttal testified he was sane. We find nothing improper with counsel's decision to call the court-appointed doctors as defense witnesses.

### 7. *Defense experts' fees*

■ Defendant next alleges counsel were ineffective for failing to object to the prosecutor's inquiry into the fees charged by the defense experts. The claim is meritless because such inquiry is specifically authorized by statute (Evid. Code, § 722, subd. (b)). We also note that, for this reason, the prose-

---

did not object to the procedure because "[t]he officer assures us that he has not and will not discuss the occurrence with anyone." On these facts, we find no evidence of ineffective counsel.

cutor did not object when defense counsel made a similar inquiry of the court-appointed psychiatrists.

### 8. *Transfer to Lake County*

 Defendant faults counsel for failing to transfer the pretrial motions to Lake County. This issue has been discussed above. In any event, trial counsel made it clear they wished the pretrial motions heard in Shasta County for tactical purposes, and we perceive no ineffective performance in this regard.

### 9. *Stipulation to identity of two victims*

 Defendant asserts trial counsel should not have stipulated to the identity of Slavik and Moore because the stipulation "deprived [him] of showing reasonable doubt that the two decomposed bodies were the alleged victims." The evidence shows that both victims were positively identified by their dental records; requiring the prosecutor to produce an expert to testify to this effect would have served no useful purpose. Defendant had confessed to murdering the women whose bodies he "found" at the Igo dump, and the defense theory was that defendant killed these women but that he was insane. We fail to see how he was prejudiced by the stipulation.

 Defendant similarly contends counsel were ineffective because they stipulated to the bite marks on Selix's body. If counsel did not stipulate to the bite marks, the prosecutor could have placed two experts on the stand, who, the record shows, would have positively identified the bite marks as those of defendant. We have never held counsel ineffective for stipulating to facts that may be readily proved. By doing so counsel avoided presentation of unnecessary gory details. This is a matter of trial tactics.

### 10. *Testimony of prosecution witness Hale*

 Defendant challenges counsel's failure to object to certain testimony by witness Hale. This issue has been discussed, *ante*, at page 1093. Trial counsel were not ineffective for failing to object to the testimony, because it tended to support their theory that defendant was mentally unstable.

### 11. *Testimony of Detective Brewer*

 Defendant objects to Detective Brewer's testimony concerning the community attitude about the Selix murder and the circumstances surrounding defendant's agreement to take a polygraph examination. The record reveals that the testimony simply traced the police investigation; it was

entirely proper and relevant. In any event, defendant cannot show that introduction of the testimony prejudiced his case.

### 12. *Motion to quash*

■■■ Defendant asserts counsel "improperly and belatedly" moved to quash one of the victims' lineup identification. Our review of the record reveals that the motion was properly made. Counsel did not move to suppress the identification until after the victim testified, but the motion was not denied on the basis of untimeliness. Further, because defendant's confession positively identified him as the assailant, we fail to see how defendant could have been prejudiced.

### 13. *Uncharged crimes contained in defendant's list of crimes*

■■■ Defendant asserts the uncharged assaults contained in his written list of crimes should have been excised. Although it might have been both possible and reasonable to do so, we fail to see how defendant was prejudiced; the trial court explained to the jury that "sometimes charges can't be proved for various reasons and so they are not made." In addition, pursuant to a stipulation, the jury was specifically instructed that it was not to "concern itself with the reasons these two crimes were not charged in this case." (*Ante,* p. 1094.)

Similarly, defendant challenges the stipulation regarding the uncharged offenses. We fail to perceive in what way the stipulation was improper. Absent evidence that the jury failed to follow the court's instruction, we cannot conclude defendant was prejudiced by the stipulation.

### 14. *Defense psychiatrists' reports*

■■■ Defendant next asserts trial counsel "relinquished [his] right not to lighten the burden of the People and [waived] the self-incrimination privilege" by allowing the prosecutor to review the written reports of the defense psychiatrists. Under Evidence Code sections 356, 721, and 771, however, the prosecutor was entitled to review the written reports of the defense psychiatrists for purposes of cross-examination. Providing the prosecutor with copies of these reports simply expedited cross-examination of the witnesses. We find no impropriety in counsel's actions.

### 15. *Narcoanalysis testimony*

■■■ Defendant challenges Drs. Kaldor's and French's competency to testify about Dr. Axelrad's narcoanalysis session with defendant. He sug-

gests trial counsel were ineffective for failing to prevent the testimony. Our review of the record discloses that both doctors were qualified to testify about hypnosis and narcoanalysis. We therefore find the allegation meritless.

### 16. *Failure to object to closing arguments and asserted misconduct*

 Defendant faults counsel for failing to object to "inflammatory and highly prejudicial remarks" made by the prosecutor during guilt and penalty phase closing arguments. We have previously addressed each of these claims (*ante,* pp. 1088-1094). The statements complained of did not constitute prosecutorial misconduct, and defendant has not established that trial counsel's failure to object prejudiced his case.

Defendant also asserts counsel were ineffective because they failed to move for a mistrial based on "the prosecutor's improprieties." This is the identical claim that we have rejected under claims of prosecutorial misconduct and ineffective assistance of counsel for failure to object. Our review of the record reveals that any motion for mistrial on the grounds alleged would have been denied. Defendant has therefore not established that he was prejudiced by counsel's failure to make the suggested motions for mistrial.[17]

### G. *Asserted "Trial Court Errors"*

Defendant next submits a list of numerous asserted "trial court errors." Many of these claims simply repeat assertions resolved above, under other headings. The remaining points are discussed below.

### 1. *Separate juries*

 Defendant alleges the court should have granted his motion for separate guilt and penalty phase juries. We rejected an identical claim in

---

[17]Finally, defendant appears to fault counsel for failing to challenge, in essence, the entirety of Lieutenant Eoff's testimony. Our review of the record reveals the testimony was properly admitted.

Defendant also raises an obscure claim concerning common law motions to suppress. The record reveals that trial counsel sought pretrial suppression of the Brewer confession and the August 24th statements in both Shasta and Yolo Counties.

It also reveals that counsel obtained suppression of the Brewer confession in the Yolo Superior Court. Defendant fails to explain how trial counsel's conduct constitutes ineffective performance, what counsel should have done differently, or how defendant was prejudiced by counsel's conduct. Because we have found the August 24 statements admissible, defendant suffered no possible prejudice as a result of whatever error trial counsel allegedly committed.

*Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 68 [168 Cal.Rptr. 128, 616 P.2d 1301], and *Miranda, supra,* 44 Cal.3d 57, 79.

### 2. *Restrictions on voir dire*

 Defendant asserts his voir dire of prospective jurors was improperly restricted, but he provides no explanation or evidence in support of the allegation. He does cite *People* v. *Williams* (1981) 29 Cal.3d 392 [174 Cal.Rptr. 317, 628 P.2d 869], in which we held that counsel may ask during voir dire questions that are "reasonably designed to assist in the intelligent exercise of peremptory challenges whether or not such questions are also likely to uncover grounds sufficient to sustain a challenge for cause." (29 Cal.3d at p. 407.) *Williams* overruled our holding in *People* v. *Edwards* (1912) 163 Cal. 752, 753-756 [127 P. 58], that voir dire could not be used with an eye toward peremptory challenge. *Williams,* however, was not filed until after the voir dire in defendant's case was completed, and we specifically noted that our holding in *Williams* was to be given prospective effect only. (29 Cal.3d at p. 412, fn. 15.)

Our independent review of the record reveals that the court refused to allow either side to ask any question that would require a prospective juror to prejudge the case. Nor did the court allow either party to discuss the law—such as the meaning of diminished capacity—or ask questions that required the prospective jurors to pretry the facts of the case. The trial court informed counsel that "the most important question is whether [the juror] will follow the law as the court reads it . . . ."

Early in the voir dire examination, trial counsel informed the court, "we are objecting to the limitation on our use of the facts of this case to determine death penalty attitudes. We have observed that there are people that would not automatically impose the death penalty for a murder with the special circumstances, but then when those same people find out that it is not one murder, but four murders, that it is not only four murders, but murders accompanied by sexual misuse, not only that, but even a child involved, that that will substantially increase the number of individuals [who would automatically vote for the death penalty]." The court explained, "what I am concerned about is a seesaw battle between defendant and prosecution over what the facts of the case will be. Of course, that provokes endless controversies and endless confusion and is undesirable and I want to avoid that."

The prosecutor and defense thereafter agreed on a question that read, "If the facts in this case disclose that [defendant] is guilty of four separate murders and multiple rapes, including the murder of an eleven-year-old girl

who was sexually abused and was killed by being thrown off a high bridge, would those facts trigger emotional responses in you that would make it hard to consider life imprisonment without possibility of parole, or would you under those circumstances vote for the death penalty?" This question fully comports with the law existing at the time the voir dire examination was held.

██ We also note that even under *Williams* voir dire may not be used to " 'to educate the jury panel to the particular facts of the case, [or] to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law.' " (29 Cal.3d at p. 408, quoting *Rousseau* v. *West Coast House Movers* (1967) 256 Cal.App.2d 878, 882 [64 Cal.Rptr. 655].) ██ Accordingly, we find nothing in the record to support the claim that defense counsel's questioning during voir dire was improperly limited.

### 3. *Presence at informal proceedings*

██ Defendant claims he was denied his right to be present during some of the informal pretrial and trial proceedings. The pretrial proceedings concerned various administrative procedures necessary to transfer the case to another county. Defendant orally waived his presence at those proceedings. Later, defendant signed a waiver of his presence pursuant to section 977, subdivision (b).

The trial proceedings concerned alleged violations by the press of defendant's privacy. Apparently, the press discovered and reported that defendant wished to be married. Defendant sought a hearing with the court to discuss the alleged improper invasion. The court declined to hold a hearing "off the cuff." Instead, it asked for informal briefing on the matter, and said it would consider holding a hearing with defendant present, after it received such briefing. The record does not disclose whether defendant's counsel submitted briefs on the matter, and apparently no hearing was held.

We conclude defendant's absence from the various proceedings was proper. None of the proceedings had a " ' "reasonably substantial relation to the fullness of [defendant's] opportunity to defend against the charge." ' " (*People* v. *Jackson, supra,* 28 Cal.3d 264, 309.)

### 4. *Hearsay objection*

██ Defendant claims the court should have sustained his hearsay objection to certain testimony by Deputy Scott, who testified to victim Kelly

M.'s statement—shortly after the assault—that defendant told her (in graphic terms) that he was going to force her to participate in anal intercourse. The court overruled the objection, finding Kelly M.'s statement admissible under the "fresh complaint" exception to the hearsay rule. We agree that the statement was admissible, and in any event we cannot imagine that this testimony amounted to prejudicial error in light of the other evidence.

### 5. Relevance of evidence

 Defendant challenges the court's ruling that certain evidence was admissible. At trial, a sales clerk testified that he sold Annette Selix two cans of Squirt soft drink the night she disappeared. (The sales clerk also testified that Selix had purchased two tubs of Blue Bonnet margarine; two such tubs were discovered in defendant's refrigerator.) A police officer testified that he found six cans of Squirt in defendant's burn barrel and that two of the cans appeared to have been burned while they were full. Trial counsel objected to the admissibility of this evidence on relevancy grounds, arguing that there was no evidence that the Selix girl had purchased six cans of Squirt. The court observed that the sales clerk might have been mistaken (i.e., that Selix did purchase a six-pack) or that defendant threw four more cans of Squirt in the barrel along with the two that Selix had purchased. Accordingly, the court overruled the objection stating, "I think they are material and should be received for whatever value they may have and that will enable counsel to argue the inferences [to be drawn therefrom]."

We agree with the trial court's conclusion; defendant's objection went to the weight of the evidence, not to its admissibility. But even if we were to assume error, any error was clearly harmless. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Defendant had confessed to picking up Selix, driving her to his house, and later throwing her off a bridge. The medical evidence showed that Selix had been raped, sodomized and forced to perform oral copulation. Further, defendant's claim was that he was insane when he killed Selix, not that he was innocent. Thus, it is not reasonably probable that a more favorable result would have been reached in the absence of the alleged error.

### 6. Admissibility of photographs

 Defendant asserts certain photographs were erroneously admitted in evidence over objection. Trial counsel argued that the prejudicial effect of the photographs outweighed their probative value. The court ruled the prosecution "ha[s] a right to prove [its] case" and concluded that the photo-

graphs "ha[d] more probative value than prejudice." Defendant renews his claim here. We conclude that the trial court did not err in admitting the photos.

The photographs were ruled admissible because the trial court found them probative on the issue of malice. We have said that photographs "disclosing and corroborating the manner in which the crime was committed, [are] clearly relevant to the issue of malice." (*People* v. *Ramos* (1982) 30 Cal.3d 553, 576 [180 Cal.Rptr. 266, 639 P.2d 908].) We will not disturb the trial court's ruling on the admissibility of photographs "unless the prejudicial effect clearly outweighs the photos' probative value." (*Ibid.*) Defendant does not dispute the relevance of the photographs and therefore provides no evidence that the prejudicial effect "clearly outweighed" their probative value.

Defendant insists, however, that the offer to stipulate precluded introduction of the photographs. He relies on language in *Ramos,* that " 'if a defendant offers to admit the existence of an element of a charged offense, the prosecutor must accept that offer and refrain from introducing evidence . . . to prove that element to the jury.' " (30 Cal.3d at p. 577, quoting *People* v. *Hall* (1980) 28 Cal.3d 143, 152 [167 Cal.Rptr. 844, 616 P.2d 826].) Trial counsel, however, offered to stipulate only that the wounds Selix sustained proved that she was alive when thrown off the bridge. Counsel did not offer to stipulate to the issue of malice. Accordingly, the trial court did not err in admitting the photographs.

### 7. *Testimony about a victim's purse*

Defendant also challenges the court's ruling on his objection to testimony concerning a purse. As noted above, Patricia Moore's purse was ordered suppressed pretrial. At trial, the prosecutor introduced testimony that Patricia was last seen with a specified purse and that the purse was not found in certain locations. The prosecutor explained to the court that it wished the jury to know that Patricia Moore was last seen with a purse and that it was not found in her motel room following her disappearance. He argued that although this was insufficient evidence to support a felony-murder-robbery instruction it did explain why the investigation of her murder was hampered. The court allowed the testimony, but the jury never learned that the purse had been found.

Arguably, the evidence was relevant and admissible. In any event, we do not see how defendant was prejudiced by testimony concerning the fact that Patricia Moore owned a purse that was not found in her motel room.

### 8. *Objection to prosecutor's questions to rebuttal witness*

 Defendant challenges the court's ruling on his objection to testimony by Dr. Kaldor. The prosecutor sought to ask Dr. Kaldor questions on rebuttal pertaining to "malice aforethought, deliberation, premeditation, unconscious acts, rape, lewd and lascivious conduct." Defense counsel objected on the ground that the "ultimate question" (i.e., whether Dr. Kaldor believed defendant suffered from insanity or diminished capacity at the time he committed the crimes) had already been asked and answered. The prosecutor pointed out that the "underlying questions" he sought to ask had not been previously posed. The court overruled the objection. Our review of the record reveals that the questions had not previously been asked and answered; accordingly we believe the ruling was correct.

### 9. *Testimony about an expert witness's report*

 Defendant claims the court erred in allowing Dr. French to testify regarding Dr. Axelrad's report; this issue has been discussed in the context of a prosecutorial misconduct claim (see *ante,* p. 1088). We add here only that the evidence was clearly admissible under Evidence Code section 356 and that we do not believe the court's ruling was incorrect.

### 10. *Jury admonishments*

 Defendant insists the court committed reversible error by its occasional failure to admonish the jury in accordance with section 1122, which directs the jury to refrain from discussing the case, etc., before final submission. The record reveals that the jury was admonished dozens of times throughout the trial, and that defendant failed to call the court's attention to its occasional omission at the time of adjournment. Moreover, in the absence of proof of prejudice, we will not speculate that the court's omissions in this regard warrant reversal. (*People* v. *Gastelum* (1965) 237 Cal.App.2d 205, 207 [46 Cal.Rptr. 743].)

### H. *Guilt Phase Issues Raised by Amicus Curiae*

The California Appellate Project, as amicus curiae, raises a number of issues relating to the jury instructions.

### 1. *Instructions on malice*

 Of course, a finding of malice is necessary to support a murder conviction pursuant to section 187. We recently observed in *People* v. *Croy*

(1985) 41 Cal.3d 1 [221 Cal.Rptr. 592, 710 P.2d 392]: "In *People* v. *Conley* (1966) 64 Cal.2d 310, 316-322 [221 Cal.Rptr. 592, 710 P.2d 392], we surveyed precedent spanning several decades in support of our pronouncement that under our Penal Code [as it existed at the time of *Croy* and of the present trial] malice aforethought is to 'be distinguished from that state of mind described as "wilful, deliberate, and premeditated . . . ." ' (*Id.,* at p. 321; [citations].) Malice, we stated, is characterized by the exhibition of 'wanton disregard for human life or antisocial motivation . . . .' (*People* v. *Conley, supra,* 64 Cal.2d at p. 322.) More precisely, '[a]n intentional act that is highly dangerous to human life, done in disregard of the actor's awareness that society requires him to conform his conduct to the law, is done with malice.' . . . [¶] Malice, then, is quite different from the 'state of mind described as "wilful, deliberate, and premeditated." . . . The latter phrase encompasses the mental state of one who carefully weighs the course of action he is about to take and chooses to kill his victim after considering reasons for and against it. [Citation.]' (*People* v. *Conley, supra,* 64 Cal.2d at pp. 321-322.) While we have recognized that in most circumstances '[a] person capable of achieving such a mental state is normally capable also of comprehending the duty society places on all persons to act within the law' (*id.,* at p. 322), there are situations where this is not so. 'If,' for example, 'because of mental defect, disease, or intoxication . . . the defendant is unable to comprehend his duty to govern his actions in accord with the duty imposed by law, he does not act with malice aforethought and cannot be guilty of murder in the first degree.' " (*Croy, supra,* 41 Cal.3d at pp. 18-19, fn. omitted.)[18]

 Amicus curiae maintains that the jury instructions on malice were "confusing and incomplete" and "permitted the jury to find first-degree murder without deciding whether evidence of [defendant's] mental state negated a finding of express malice." As amicus curiae notes, these instructions related to two of the murder counts (II and III), and the special circumstance findings on counts III and IV.

The jury was instructed on malice as follows: "Malice may be either express or implied. [¶] Malice is express when there is manifested an intent to unlawfully kill a human being. [¶] Malice is implied when the killing results from an act involving a high degree of probability that it will result

---

[18] The footnote in *Croy* read, "In 1981, the Legislature amended section 188 to delete from the definition of malice '[a]n awareness of the obligation to act within the general body of laws regulating society.' In 1982, the provision was amended once more, to state that acting despite such awareness is also not included in the definition of malice. These amendments were enacted after appellant committed his alleged offenses, and we pass no judgment regarding what the term malice aforethought denotes in light of these revisions." (41 Cal.3d at p. 18, fn. 12.) As in *Croy,* the offenses in this case occurred before the amendments to section 188.

in death, which act is done for a base antisocial purpose and with a wanton disregard for human life, by which is meant an awareness of duty imposed by law not to commit such acts followed by the commission of the forbidden act despite that awareness. . . ." (CALJIC No. 8.11, as modified by the court.)

The jury was also instructed: "All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree. [¶] The word 'willful' as used in these instructions means intentional. [¶] The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and· weighing of considerations for and against the proposed course of action. The word 'premeditated' means considered beforehand. [¶] If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree. [¶] The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. [¶] The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a more unconsidered and rash impulse, even though it includes an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree. [¶] To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice, and having in mind the consequences, he decides to and does kill." (CALJIC No. 8.20, as modified by the court.)

Amicus curiae suggests that, based on CALJIC No. 8.11 and the instructions as a whole, the jury might not have realized that to find either express or implied malice it was required to find that defendant was able "to comprehend his duty to govern his actions in accord with the duty imposed by law." (*Croy, supra,* 41 Cal.3d at pp. 18-19.) Additionally, amicus curiae asserts, CALJIC No. 8.20 inadequately conveyed the requirement of a malice finding to support a murder conviction.

Considering the instructions as a whole (*People v. Burgener* (1986) 41 Cal.3d 505, 538-539 [224 Cal.Rptr. 112, 714 P.2d 1251]), we find they adequately informed the jury. We note that in addition to the above instructions, the jury was further instructed: "Also, if you find the defendant's

mental capacity was diminished to the extent that you have a reasonable doubt whether he was able to form the mental states constituting either express or implied malice aforethought, you cannot find him guilty of murder of either the first or second degree. [¶] If you have a reasonable doubt, one, whether he was able to form an intention unlawfully to kill a human being, or two, whether he was aware of the duty imposed on him not to commit acts which involve the risk of grave injury or death, or three, whether he did act despite that awareness, you cannot find that he harbored express malice. [¶] Further, if you have a reasonable doubt, one, whether his acts were done for a base antisocial purpose, or two, whether he was aware of the duty imposed on him not to commit acts which involve the risk of grave injury or death, or three, whether he did act despite that awareness, you cannot find that he harbored implied malice. . . ." (CALJIC No. 8.77, as modified.)

Thus, the jury was expressly instructed that if it entertained a reasonable doubt whether defendant appreciated his duty to act within the law, or whether defendant was capable of acting in accordance with the law, it could not convict defendant of first or second degree murder. In convicting defendant of second and first degree murder on counts II and III, therefore, the jury necessarily found that defendant knew the killings were unlawful and knew his societal duty not to injure or kill, but killed in spite of his awareness of these obligations. ▮▮▮▮ We conclude that the instructions, considered as a whole, properly informed the jury of the requisite finding of malice.[19]

## 2. *Instructions on Provocation*

▮ Amicus curiae next contends the court failed to instruct on the "effect of provocation and heat of passion to negate premeditation and deliberation." It points to the opinion of defense experts that defendant suffered from an "explosive" personality and claims that, in light of this evidence, the trial court was under a sua sponte duty to instruct in the language of CALJIC Nos. 8.42 and 8.73. We find the evidence insufficient to warrant giving these instructions.

---

[19] We do not share the concern of amicus curiae over the court's inadvertent misreading of CALJIC No. 8.72 to the jury. CALJIC No. 8.72 provides, "If you are satisfied beyond a reasonable doubt that the killing was unlawful, but you have a reasonable doubt whether the crime is murder or manslaughter, you must give the defendant the benefit of such doubt and find it to be manslaughter rather than murder." The trial court inadvertently read "are not satisfied" instead of "are satisfied." (Apparently, the verbal delivery of the instructions was transcribed and given to the jury for use during deliberations.)

Even as read, we believe the instruction, reasonably interpreted, adequately conveyed the meaning of CALJIC No. 8.72, and that, in the context of the instructions as a whole, it did not misinform the jury to defendant's prejudice on the definition of malice and the necessity of a finding of malice.

CALJIC No. 8.42 provides, "To reduce an intentional felonious homicide from the offense of murder to manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of such character and degree as naturally would excite and arouse such passion, and the assailant must act under the smart of that sudden quarrel or heat of passion. . . ."[20]

Amicus curiae asserts the victims' resistance to being raped could have provoked defendant to explode. We have long recognized that "the fundamental of the inquiry [into whether provocation has negated malice] is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion—not necessarily fear and never, of course, the passion for revenge—to such an extent as would render *ordinary men of average disposition* liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." (*People* v. *Logan* (1917) 175 Cal. 45, 49 [164 P. 1121], italics added.) Thus, under CALJIC No. 8.42, determination of the sufficiency of provocation is made by an *objective* standard; defendant's subjective response is immaterial.

 In *People* v. *Jackson, supra,* 28 Cal.3d 264, 306, we concluded evidence "that defendant may have become enraged and brutally attacked and killed one of his elderly victims because she was awakened during the burglary and began to scream" was insufficient to show that he killed his victims in a heat of passion on sufficient provocation. We observed, "[n]o case has ever suggested . . . that such predictable conduct by a resisting victim would constitute the kind of provocation sufficient to reduce a murder charge to voluntary manslaughter." (*Ibid.*) The analysis is the same for a reduction to second degree murder; the inquiry is whether the ordinary person would "explode" because the victim resisted. Therefore, defendant's subjective response to his rape victims' resistance is relevant only as it tends to establish he acted under diminished capacity. We hold that the victims' resistance to the criminal act of rape is "predictable conduct" and is insufficient provocation to negate malice.

---

[20] The instruction continues, "The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which he was placed and the facts that confronted him were such as also would have aroused the passion of the ordinarily reasonable man faced with the same situation. The question to be answered is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment. [¶] If there was provocation, but of a nature not normally sufficient to arouse passion, or if sufficient time elapsed between the provocation and the fatal blow for passion to subside and reason to return, and if an unlawful killing of a human being followed such provocation and had all the elements of murder, as I have defined it, the mere fact of slight or remote provocation will not reduce the offense to manslaughter."

■ Nor do we believe the court erred in failing to deliver CALJIC No. 8.73 sua sponte. That instruction provides: "When the evidence shows the existence of provocation that played a part in inducing the unlawful killing of a human being, but also shows that such provocation was not such as to reduce the homicide to manslaughter, and you find that the killing was murder, you may consider the evidence of provocation for such bearing as it may have on the question of whether the murder was of the first or second degree."

Contrary to amicus curiae's assertion, there was no evidence in the record tending to show the existence of provocation by the murder victims. Amicus curiae relies on statements defendant made to examining psychiatrists, but as noted above, these hearsay statements were admitted only for the limited purpose of showing the information on which the medical experts based their opinions. The statements could not be used to prove the truth of the matter asserted.

Furthermore, the defense theory was that defendant was suffering from diminished capacity at the time he committed the murders, not that he was sane but provoked by the victims. No argument supporting the latter theory was presented, nor was the jury provided with any evidence that would support such a finding. We perceive no error.

## IV. SPECIAL CIRCUMSTANCE ISSUES

Under the 1977 death penalty law (former § 190.2, subd. (c)), the "multiple-murder special circumstance" required a finding that "[t]he defendant was personally present during the commission of the act or acts causing death, *and with intent to cause death* physically aided or committed such act or acts causing death and any of the following additional circumstances exists: . . . (5) The defendant has in this proceeding been convicted of more than one offense of murder of the first or second degree . . . ." (Italics added.) Defendant asserts the court improperly instructed the jury because "it failed to give an instruction on 'intent to kill' " with respect to the multiple-murder special circumstance.

Defendant's claim affects only the multiple-murder special circumstance contained in count I (the murder of Annette Edwards); as to the multiple-murder special circumstances found true in counts III and IV (the Slavik and Selix murders), the jury found the murders to be "wilful, deliberate and premeditated." The jury did not find, however, that defendant intended to kill Edwards. Therefore, defendant asserts, the multiple-murder special circumstance found true in count I must fall.

The People concede error as to this latter multiple-murder special-circumstance finding, and agree that it must be set aside. Additionally, we must set aside one of the two remaining multiple-murder special-circumstance findings. In a case of multiple murders, only one multiple-murder special circumstance should be alleged and found true by the jury. (*People* v. *Allen, supra,* 42 Cal.3d 1222, 1273; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1150 [240 Cal.Rptr. 585, 742 P.2d 1306].) Accordingly, two of the multiple-murder special circumstances must be set aside, and only one should have been found true.

## V. PENALTY PHASE ISSUES

### A. *Prejudicial Effect of "Excessive" and/or "Invalid" Multiple-murder Special Circumstances*

 As noted above, the jury erroneously found, and hence considered at the penalty trial (former § 190.3, factor (a)), three multiple-murder special circumstances instead of one. We conclude, however, that the error was harmless. The jury did not consider any evidence that was not otherwise admissible and relevant to the penalty decision. It was fully aware that the multiple murders it was considering were the murders of Edwards, Slavik and Selix, and was fully aware that the multiple-murder special circumstances involved only these murders. (*Allen, supra,* 42 Cal.3d at pp. 1281-1283 [improper charging and consideration of 11 witness-killing, prior-murder-conviction, and multiple-murder special circumstances instead of 3 such special circumstances harmless error].) Even assuming, as the People concede, that one of the three findings was not merely "excessive" but was also *invalid,* we still must conclude, as we did in *People* v. *Silva* (1988) *ante,* pages 604, 632-636 [247 Cal.Rptr. 573, 754 P.2d 1070], that the properly admitted aggravating evidence was simply overwhelming, and that on this record there is no reasonable possibility that the error affected the penalty verdicts.

### B. *Failure to Instruct on the Result of a Hung Jury*

 Defendant asserts, without case support or argument, that the court erred in refusing to instruct at the start of penalty deliberations that defendant would be sentenced to life without possibility of parole if the jury could not reach a verdict. We have rejected this contention in the past, most

recently in *Miranda, supra,* 44 Cal.3d at page 105. In our view, such an instruction would have diminished the jurors' sense of duty to deliberate, and to be open to the ideas of fellow jurors. The effect of a hung jury is irrelevant to the jury's deliberation of any issue before it. (See *People* v. *Kimble* (1988) 44 Cal.3d 480, 511-516 [244 Cal.Rptr. 148, 749 P.2d 803] [failure to instruct pursuant to 1977 law on consequences of deadlock in response to jury question not error].) The court properly refused the requested instruction.

## C. *Instructions on Mitigating Evidence*

Defendant and amicus curiae assert the court erred in failing to affirmatively instruct the jury that it could consider the full range of defendant's proffered mitigating evidence in determining the appropriate sentence. The trial court, however, modified former factor (j) of the standard 1977 death penalty instructions to inform the jury that it could consider as a mitigating factor "[*t*]*he defendant's background, history and character or any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime.*" (Italics added.) In addition, the prosecutor told the jury that factor (j) was "a catchall," described its scope in terms that predicted precisely the court's modified instruction, and concluded simply, "I can think of no extenuating circumstances in this particular case." Similarly, defense counsel told the jury that factor (j) "leaves a lot of things for you to consider and that is why all the evidence that has been presented so far is now before you." Counsel then summarized defendant's troubled history, and argued that the evidence suggested defendant would be well-behaved in a structured prison environment.[21] On this record, we find no error. (See *Kimble, supra,* 44 Cal.3d at pp. 509-510 [factor (j) of 1977 death penalty law]; *Allen, supra,* 42 Cal.3d 1222, 1276 [factor (k) of 1978 death penalty law].)

## D. *Failure to Discharge the Penalty Jury*

Defendant and amicus curiae assert the court erred in failing to discharge the penalty jury after the jury informed the court that it was

---

[21] Defendant also asserts there was "no stipulation that the jury could consider the guilt phase evidence" during its penalty phase deliberations. The record reveals that after both parties declined to present further evidence, the court asked, "[t]he matter is then to be submitted upon the basis of the evidence heretofore adduced, I presume?" The prosecutor agreed. Thereafter the jury was instructed, "[i]n determining which penalty is to be imposed on the defendant, *you shall consider all of the evidence which has been received during any part of the trial of this case* except as you are heretofore instructed." (Italics added.) Defendant's claim is thus meritless.

unable to reach a verdict. On December 18, 1980, the penalty trial began and was submitted to the jury on the evidence presented during the guilt phase. That afternoon the jury sent the court a note which read, "The jury is unable to reach a verdict." The court brought in the jury and stated, "This has been a long trial. At the time I received your note you had been deliberating a little more than one hour on the subject of penalty. The penalty in a case of this type is a subject about which reasonable people can disagree. In my opinion you have not been deliberating long enough to discuss the matter fully and to understand fully each other's viewpoint. [¶] It has been a tiring day, an emotionally charged day. I am going to send you home now and ask you to return tomorrow morning at 9 o'clock and to resume deliberations at that time."

Defendant insists the jury should have been discharged once it stated it was unable to reach a verdict. Section 1140 provides, "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless . . . at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree."

We have held that the trial court is vested with broad discretion in determining whether there is a "reasonable probability" of agreement. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 775 [230 Cal.Rptr. 667, 726 P.2d 113].) In *Rodriguez,* the trial court denied a motion for mistrial after the jury, on the 18th day of deliberations, notified the court that it was "hopelessly deadlocked." The jury had sent similar messages on four previous occasions. The court requested the numerical division and then instructed the jury to continue deliberating. The jury reached a verdict four days later. We found that, in light of the length of the trial, the amount of evidence, and the complexity of the issues, the court "could reasonably conclude that his direction of further deliberations would be perceived as a means of enabling jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered." (*Id.,* at p. 776.) We therefore concluded that the court did not abuse its discretion in directing the jury to continue deliberations.

In this case, the jury had been deliberating for only one hour, not eighteen days, before informing the judge that it could not reach a verdict. It appears clear to us that, as the trial court noted, the jury had not been deliberating for a time sufficient "to discuss the matter fully and to understand fully each other's viewpoint." The court's statement to the jury was in

no way coercive and there existed a reasonable probability that the jury could reach a verdict—one way or the other—if it deliberated further. We therefore find no error in the court's action.

### E. *Failure to Present Mitigating Evidence*

■ Defendant asserts trial counsel failed to present mitigating evidence during the penalty phase and that this omission constituted error under *People* v. *Deere* (1985) 41 Cal.3d 353 [222 Cal.Rptr. 13, 710 P.2d 925]. Unlike in *Deere,* however, the record here does not disclose that defense counsel declined to present additional evidence during the penalty trial merely because his client "vetoed" presentation of such evidence. Instead, the record reveals that, as one of defendant's counsel expressly told the jury, they had presented all of their evidence at the guilt phase and there was nothing more to present.

During the guilt phase opening statement, defense counsel informed the jury, "We will present such evidence as to allow you to know more about [defendant's] criminal activity than the police do right now. We will present such evidence as to allow you to know more about [defendant] than he does right now."

As noted above, the defense introduced substantial "mitigating" evidence in the course of its guilt phase presentation. (*Ante,* pp. 1070-1073.) During the guilt phase closing argument, defense counsel reminded the jury, "[w]e have brought some information that was a duplicate of other information. We have been redundant on some of the information [which], isolated, may not have struck you as important. And that is inherent to the type of presentation we were trying to make, *to reconstruct an entire life.*" (Italics added.)

During the penalty phase closing argument, defense counsel reiterated, "We have done everything we can to provide you with as much information as we could about [defendant]." Counsel also explained, "The judge will tell you . . . that the law says you are to consider [defendant's] character, background, history and mental condition. That leaves a lot of things for you to consider and that is why all the evidence that has been presented so far is now before you. [¶] And the reason we are not presenting more evidence is obvious. We have presented everything. You have everything we have to present and everything to consider. [¶] You have an overview of [defendant's] life. I submit to you that no person is born to kill others, that

an individual who ends up taking another person's life does so because of the pressures, the influences, the factors that develop as he grows up, as he develops his own character. [¶] You understand what factors influenced [defendant's] development. You understand the strife in the home. You understand that before the divorce of his parents while [defendant] had many problems, he was not involved in the type of overt trouble that occurred after the divorce. [¶] You know that after the divorce for the first time [defendant] started coming in conflict with the law, but they were unusual-type conflicts. Even the people at the California Youth Authority noted that and . . . you also know that [defendant] on two previous occasions at least has been confined for a period of time in some type of penal institution, once Crystal Creek Conservation Camp in Redding, California and the second time for over a year I believe in the California Youth Authority. [¶] You have the written reports, the written files from the California Youth Authority on how [defendant] behaved when his freedom was taken away from him, when he was put under very strict controls in a government institution, and you will find in reviewing those documents that [defendant] behaved well, had a good record and when he was released and still under the control of the parole officer who was watching over him, giving him guidance, that [defendant] did very well. [¶] After [defendant] got out of the youth authority, again, he had some degree of guidance, some degree of help from the parole officer for a period of time. You will find that he obtained, kept a good job, made a good work record, did not involve himself in crimes of violence until the spring and summer of 1978."

In light of the voluminous evidence trial counsel presented during the guilt phase, we cannot fault their decision to submit the penalty issue to the jury on the basis of the evidence previously presented. Trial counsel made it clear that they were not presenting additional evidence because they had nothing more to offer. *Deere, supra,* 41 Cal.3d 353, is therefore inapplicable.

Further, the record suggests that counsel's decision not to introduce additional evidence was a sound tactical choice. Out of the presence of the jury, the prosecution informed defense counsel that it was considering introducing at the penalty phase evidence of defendant's poor conduct in jail during the course of trial. Defense counsel argued that the prosecution could not introduce such evidence without giving advance notice. Counsel admitted that the evidence could be used in rebuttal, but maintained that "[i]t is our position . . . that *absent our putting evidence in* [at the penalty phase], the people are precluded therefrom." The prosecution presented no evidence at the penalty phase. The defense also rested, presumably reflecting a tactical choice that any additional mitigating evidence they had

would be outweighed by evidence of defendant's conduct in jail. (See *Miranda, supra,* 44 Cal.3d 57, 118-123, and cases there cited.)

F. *Prosecutorial Argument as to Absence of Mitigating Factors*

 Amicus curiae asserts the prosecutor argued that the absence of mitigating factors could be considered as aggravating factors. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 289-290 [221 Cal.Rptr. 794, 710 P.2d 861].) We have reviewed the prosecutor's closing statements and found a solitary fleeting statement suggesting that the absence of at least one, and possibly two, of the listed factors (former § 190.3, factors (d) [victim participant] and (e) [moral justification]) could be considered as aggravating.

The thrust of the prosecutor's penalty phase closing argument centered on the nature and circumstances of the crimes defendant had committed. Defense counsel, on the other hand, told the jury that not all of the statutory factors were applicable, and emphasized his thesis that (i) defendant's background and history warranted the jury's sympathy; and (ii) because defendant turned himself in, the jury should spare his life to send a message to other murderers that they may turn themselves in without fear of being sentenced to death. Thus, the arguments encouraged the jury to weigh the factors supporting mitigation and mercy against the brutal nature of the crimes.

In light of the focus of the penalty phase arguments, we do not believe the prosecutor's comments were prejudicial. As noted above, the jury was aware of its duty to consider the full range of defendant's mitigating evidence under former factor (j). Moreover, under the standard instructions given pursuant to the 1977 death penalty law (and accompanying argument by both parties) it was aware of its discretion to determine, based on the evidence, the appropriate sentence for defendant. In these circumstances, and in view of the overwhelming nature of the properly admitted aggravating evidence before the jury, we find no reasonable possibility that the prosecutor's brief mischaracterization of one or two of the statutory sentencing factors influenced the jury's sentencing decision.

G. *Former Section 190.3, Factors (c) and (g)* [22]

 Amicus curiae claims it was improper for the prosecutor to argue that the guilt and sanity verdicts indicated the jury *did not believe* defend-

---

[22] Former section 190.3 set out the factors to be considered by the jury in making its sentencing decision. Former factor (c) called on the jury to consider "Whether or not the offense

ant was acting under extreme mental illness or that he was unable to conduct himself in accordance with the law. We believe this constituted nothing more than "vigorous argument" under *Fosselman, supra,* 33 Cal.3d 572, 580.

We also note that defense counsel argued that the prosecutor's view was incorrect. He reminded the jury that the psychiatrists believed defendant was suffering from "very serious mental problems" and noted that merely because these problems "did not reach the level of insanity or diminished capacity," that did not preclude consideration of defendant's mental state in determining the sentence. Counsel asserted that people do not commit the crimes defendant committed unless "something [is] seriously wrong with them" and argued that defendant was not in complete control when he committed the murders.

In any event, any improper argument was clearly harmless. The jury was instructed—pursuant to factor (j)—to consider defendant's background and history in determining his sentence, and almost all relevant evidence of defendant's background concerned his mental state. Thus the jury undoubtedly considered defendant's mental state in determining the appropriate sentence; whether it did so under former factor (j) instead of former factors (c) or (g) is irrelevant. (See *Ghent, supra,* 43 Cal.3d 739, 776.)

▉▉▉ Amicus curiae next attacks the constitutionality of former factor (c) on the ground it impermissibly limits the jury's consideration to "*extreme* mental or emotional disturbance." (Italics added.) We have rejected this claim in *Ghent, supra,* 43 Cal.3d at page 776.

▉▉▉ Amicus curiae finally claims former factor (g), which parallels the instruction on legal insanity,[23] is unconstitutional because it fails to instruct the jury that it may consider defendant's mental state even though it found him legally sane, and because it assertedly fails to allow for consideration of

---

was committed while the defendant was under the influence of extreme mental or emotional disturbance." Former factor (g) provided the jury should consider "Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or the effects of intoxication."

[23] CALJIC No. 4.00 reads, "A person is legally insane if, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

mental "defect" as well as mental "disease." In *People* v. *Robertson* (1982) 33 Cal.3d 21 [188 Cal.Rptr. 77, 655 P.2d 279], a plurality of this court noted that, under *Lockett* v. *Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954] and *Eddings* v. *Oklahoma* (1982) 455 U.S. 104 [71 L.Ed.2d 1, 102 S.Ct. 869], the standard instruction should not be understood by the jury as precluding consideration of "mental defect" as a mitigating factor. We cannot agree, however, that a reasonable jury would have been so misled here, or that the former provision is constitutionally deficient for the reasons advanced. Nothing in the former provision suggested the jury was not free to consider defendant's "mental defect" evidence, and as noted, the jury remained free to consider all such "mental evidence" under former factor (j).

## H. *Other-crimes Instructional Error*

■ As amicus curiae notes, we have held that when the prosecution introduces "other crimes" evidence in aggravation under former section 190.3, the court must instruct sua sponte that the jury may not consider such evidence unless such crimes are proved beyond a reasonable doubt. (*Robertson, supra,* 33 Cal.3d at pp. 53-54; *People* v. *Phillips* (1985) 41 Cal.3d 29, 72 [222 Cal.Rptr. 127, 711 P.2d 423]; see *Miranda, supra,* 44 Cal.3d at pp. 97-98.) As Justice Broussard's concurring opinion in *Robertson* stated, however, "a reasonable doubt instruction should be required only when evidence of other crimes is introduced or referred to as an aggravating factor pursuant to former Penal Code section 190.3, [factor] (b). When such evidence is introduced and used only for other purposes, a defendant is not entitled to a reasonable-doubt instruction, but may be entitled to an instruction limiting the use of that evidence to the purpose for which it was admitted." (33 Cal.3d at p. 60; *Phillips, supra,* 41 Cal.3d at p. 72.)

In this case, all of the "other crimes" evidence was admitted during the guilt phase of defendant's trial. Most of this evidence was presented by the defense in an effort to establish diminished capacity, and except as noted below the prosecutor did not ask the jury to consider it in determining defendant's sentence. No reasonable doubt instruction was required as to these crimes. (*People* v. *Williams* (1988) 44 Cal.3d 883, 958-959 [245 Cal.Rptr. 336, 751 P.2d 395].)

Amicus curiae also notes that the list defendant gave to Lieutenant Eoff, purporting to contain every crime defendant committed, referred to two

crimes that were not charged in this case. As explained above, the jury was specifically instructed that it "should not concern itself with the reasons these two crimes were not charged in this case." As with the "other crimes" evidence just discussed, these two crimes were not introduced or referred to at the penalty trial; the prosecutor did not ask the jury to consider these crimes in making its sentence determination. Again, a reasonable-doubt instruction was not required.

Finally, amicus curiae notes that in closing argument the prosecutor urged the jury to consider the "strong evidence" that Slavik and Moore had been raped, even though it had not found that Slavik or Moore were murdered during the commission of a rape. Amicus curiae argues this was improper because the jury had already determined that these "other crimes" had not been proved beyond a reasonable doubt.

The Attorney General concedes error but insists it was harmless. He notes that the following evidence was properly before the jury: the willful, deliberate, and premeditated murder of Slavik; the rape, sodomy, and oral copulation, and the willful, deliberate, and premeditated murder, of 11-year-old Selix; the murder of Edwards during the commission of rape; the second degree murder of Moore; the kidnap, rape, sodomy, and forcible oral copulation of Kelly M.; the kidnap, rape, and forcible oral copulation of Robin H.; the kidnap, sodomy, forcible oral copulation, and attempted rape of Lisa S.; the rape of Marla Y.; and the assault on Donna W.

In view of this properly admitted aggravating evidence, we do not believe it reasonably possible that the jury would have reached a different result in the absence of the prosecutor's argument that defendant may have raped Slavik and Moore. We conclude the improper argument was harmless.

I. *Comment on Defendant's Future Dangerousness*

During the guilt phase, the jury learned that defendant had told a friend, "once you've killed, you can always kill again" and that killing "just doesn't bother him." The jury also learned that when one of the psychiatrists asked defendant if he would commit similar crimes in the future, defendant replied, "probably." The prosecutor reminded the jury of these statements during the penalty phase closing argument and concluded, "There is no indication that the defendant would not kill again if it served his purpose like, say, in prison."

Amicus curiae asserts this constituted an impermissible reference to defendant's future dangerousness, and that actual violence while in custody is the only type of evidence sufficiently reliable to support an inference of future dangerousness. We have, however, never so restricted the type of evidence on which a future dangerousness argument may be based. On the contrary, in *People* v. *Davenport, supra,* 41 Cal.3d 247, we held that so long as "[t]he prosecutor's comments [are] not based upon inadmissible evidence of expert testimony predicting future dangerousness" such argument is entirely proper. (*Id.,* at p. 288; see also *Miranda, supra,* 44 Cal.3d at pp. 110-111.) The prosecution here did not rely on the predictions of an expert to support its claim of future dangerousness; instead, it relied on the circumstances of the crimes defendant committed and on statements defendant made to others. The manner in which the argument was presented was proper under *Davenport* and constituted nothing more than "vigorous argument" under *Fosselman, supra,* 33 Cal.3d at page 580. ▪▪▪ ▪ (See *People* v. *Silva, supra,* 45 Cal.3d 604, 639.)[24]

### J. *Ruling on the Modification Motion*

▪ Amicus curiae claims that the court, in ruling on defendant's automatic motion for modification of the judgment (former § 190.4, subd. (e)), improperly viewed the absence of mitigating factors as a factor in aggravation. Our review of the record discloses the court acknowledged that certain potentially mitigating factors were absent, but did not explicitly state that such absence was to be, or would be, considered in aggravation. Indeed, the court listed abundant grounds for imposing the death penalty, detailing the nature and circumstances of the crimes.

▪ Amicus curiae also claims the court erroneously failed to consider "nonextreme" mental and emotional disturbance as mitigating evidence. Our review of the record, however, discloses that the court merely stated it found no evidence of "extreme mental or emotional disturbance at the time of the offenses." The court was free (as was the jury) to consider under former factor (j) any evidence of defendant's "nonextreme" mental or emotional disturbance at the time of offenses, or to consider the presence of such disturbance generally. The fact that the court failed to find sufficient mitiga-

---

[24] Finally, amicus curiae asserts the court erred in refusing to delete from the standard instructions those potentially mitigating factors that were assertedly "not present" in his case. We have previously rejected this claim in *Ghent, supra,* 43 Cal.3d at pages 776-777, and *Miranda, supra,* 44 Cal.3d at pages 104-105.

Defendant asserts the 1978 CALJIC instructions were erroneously read to the jury. The record, however, reveals that the 1977 CALJIC instructions were delivered.

tion to outweigh the aggravating factors does not mean that the court failed to consider all of defendant's mitigating evidence. Viewing the court's comments as a whole, we find no error.

CONCLUSION

The judgment of guilt, the findings of two special circumstances (former § 190.2, subds. (c)(5) & (c)(3)(iv)), and the judgment of death are affirmed.

Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.,**—I concur.

My only criticism of the majority opinion is its treatment of the prosecutor's comment concerning the effect on victims' families. Once again, as in *People* v. *Siripongs* (1988) *ante,* page 548 [247 Cal.Rptr. 729, 754 P.2d 1306], the majority construe the United States Supreme Court prohibition against *consideration* of the impact on the families of victims to be limited to *testimony.*

Such restricted reading of *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] is clearly erroneous. The purpose of excluding discussion of the grief of families, as Justice Powell made clear, is so as not "to inflame the jury." It should be obvious that a jury can be inflamed by calculated argument as well as by witness testimony. (See also *People* v. *Levitt* (1984) 156 Cal.App.3d 500, 516 [203 Cal.Rptr. 276].)

The error in permitting argument on this subject is also manifest when we note that family impact is not one of the enumerated factors permissible for the jury to consider in determining penalty (Pen. Code, § 190.3).

Despite the majority's misinterpretation of *Booth,* however, they reach a tenable result. Although the prosecutor improperly asked the jury, both in the guilt and penalty phase arguments, to consider the effect on the families at Christmas, his was a mere passing reference and he did not dwell on the

subject at length. Thus I conclude that under these circumstances the error was not prejudicial.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied August 25, 1988, and the opinion was modified to read as printed above.